No. 22-60639

# In the United States Court of Appeals
# for the Fifth Circuit

AMERICAN HOME FURNISHINGS ALLIANCE,
MISSISSIPPI ECONOMIC COUNCIL, AND
MISSISSIPPI MANUFACTURERS ASSOCIATION,

*Petitioners,*

*v.*

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

*Respondent.*

On Petition for Review of a Final Rule of the
United States Consumer Product Safety Commission

**BRIEF *AMICUS CURIAE* OF THE
NEW CIVIL LIBERTIES ALLIANCE
IN SUPPORT OF PETITIONERS**

Gregory Dolin
*Counsel of Record*
John J. Vecchione
Mark Chenoweth
Philip Hamburger
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
greg.dolin@ncla.legal

February 16, 2023    *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES.................................................. iii

CORPORATE DISCLOSURE STATEMENT ........................vii

INTERESTS OF AMICUS CURIAE........................................1

STATEMENT OF THE CASE ................................................2

ARGUMENT ........................................................................6

I. *HUMPHREY'S EXECUTOR* WILL NEED TO BE RECONSIDERED: CPSC'S STRUCTURE IS UNCONSTITUTIONAL BECAUSE EXECUTIVE POWER CANNOT BE EXERCISED BY PERSONS PROTECTED FROM REMOVAL ...6

  A.   Removal Is Part of Executive Power and Is Unqualified......8

    1.  Executive Power Includes at Least the Execution of the Law ...............................................................9

    2.  Executive Power More Generally Is the Action, Strength, or Force of the Nation .................................10

    3.  Whereas the Power of Appointment Is Qualified, the Power of Removal Is Not.........................................13

    4.  The President's Removal Authority Is Confirmed by His Duty "to take Care that the Laws be faithfully executed"........................................................................15

  B.   It Is Constitutionally Intolerable for an Executive Branch Agency to Defy Presidential Policy Preferences.....17

  C.   *Humphrey's Executor* Needs to Be Reconsidered................21

i

II. IF *HUMPHREY'S EXECUTOR* MUST BE FOLLOWED, CPSC'S
ACTIONS IN PROMULGATING THE CHALLENGED RULE ARE
UNCONSTITUTIONAL BECAUSE *HUMPHREY'S* BARS THE
AGENCY FROM EXERCISING EXECUTIVE POWER ............................. 22

    A.    *Humphrey's Executor* Forbids CPSC from
Exercising Executive Power ................................................ 23

    B.    This Court Has a Duty to Follow Precedent Faithfully ...... 27

III. CPSC'S DEFIANCE OF A CONTEMPORANEOUS STATUTE
ILLUSTRATES WHY CONGRESS MAY NOT DELEGATE
LEGISLATIVE AUTHORITY TO THE EXECUTIVE BRANCH ................... 28

CONCLUSION ........................................................................ 32

CERTIFICATE OF COMPLIANCE ......................................... 34

CERTIFICATE OF SERVICE ................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Buckley v. Valeo,*
424 U.S. 1 (1976) ................................................................. 16

*City of Arlington v. FCC,*
569 U.S. 290 (2013) ............................................................ 16

*Collins v. Yellen,*
141 S. Ct. 1761 (2021) ........................................................ 12

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n,*
592 F. Supp. 3d 568 (E.D. Tex. 2022) ................................. 25

*Cunningham v. Neagle,*
135 U.S. 1 (1890) ............................................................ 9, 15

*David B. v. McDonald,*
116 F.3d 1146 (7th Cir. 1997) ............................................ 19

*Dep't of Transp. v. Ass'n of Am. Railroads,*
575 U.S. 43 (2015) .............................................................. 28

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) ............................................................ 31

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv.,*
140 S. Ct. 1649 (2020) ........................................................ 28

*Fleming v. United States Dep't of Agric.,*
987 F.3d 1093 (D.C. Cir. 2021) ............................................. 7

*Free Enter. Fund v. PCAOB,*
561 U.S. 477 (2010) .................................... 7, 8, 9, 15, 16, 17

*Gundy v. United States,*
139 S. Ct. 2116 (2019) ........................................................ 30

*Humphrey's Ex'r v. United States,*
295 U.S. 602 (1935) .................................... 6, 21, 22, 23

*Morrison v. Olson,*
487 U.S. 654 (1988) ............................................................ 26

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. (18 How.) 272 (1855) .............................................................. 26

*Myers v. United States*,
   272 U.S. 52 (1926) .............................................. 7, 8, 9, 15, 16

*Powell v. McCormack*,
   395 U.S. 486 (1969) ........................................................................... 18

*SEC v. Fed. Lab. Rels. Auth.*,
   568 F.3d 990 (D.C. Cir. 2009)........................................................... 18

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ................................... 6, 7, 8, 10, 16, 22

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997) ................................................................................ 8

*United States v. Arthrex*,
   141 S. Ct. 1970 (2021) ..................................................................... 27

*Whitman v. American Trucking Assns.*,
   531 U.S. 457 (2001) ......................................................................... 30

*Wiener v. United States*,
   357 U.S. 349 (1958) ......................................................................... 26

## Statutes

15 U.S.C. § 2051 .......................................................................... 2, 6

15 U.S.C. § 2053 .......................................................................... 2, 3

15 U.S.C. § 2058(f)(3)(D) .................................................................. 5

15 U.S.C. § 2076 ............................................................................... 3

5 U.S.C. § 706(2)(A) .......................................................................... 6

50 U.S.C. § 4143 ............................................................................. 26

Consolidated Appropriations Act of 2023,
   Pub. L. No. 117-328, Div. BB, Title II (2022) ...................................... 5

## Regulations

87 Fed. Reg. 72,598 (Nov. 25, 2022)....................................................3, 4

## Other Authorities

2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876) ............ 18

30 Writings of George Washington (J. Fitzpatrick ed. 1939) ................ 17

ASTM F2057-23 .......................................................................... 5

*Brett M. Kavanaugh, Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907 (2014) .................................... 29

Declaration of Independence ................................................... 18

H.R. 1314, 117th Cong. (June 24, 2021) ................................ 29

H.R. 2211 116th Cong. (Sept. 18, 2019) ................................ 29

H.R. 5442, 114th Cong. (June 9, 2016) .................................. 29

James Madison (June 22, 1789), *in* 11 Documentary History of the First Federal Congress 1032 (Charlene Bangs Bickford, *et al.*, eds.) (The Johns Hopkins Univ. Press, 1992) .............................. 14

John Vining (May 19, 1789), *in* 10 Documentary History of the First Federal Congress 728 (Charlene Bangs Bickford, *et al.*, eds.) (The Johns Hopkins Univ. Press, 1992) .............................. 13

*Justice Kagan and Judges Srinivasan and Kethledge Offer Views from the Bench*, 92 Stan. Law. In Brief (2015), https://stanford.io/3qw1UuM ............. 26

Letter from James Madison to Thomas Jefferson (June 30, 1789) .......... 7

Letter from James Madison to Thomas Jefferson (June 30, 1789), *in* 16 Documentary History of the First Federal Congress 893 (Charlene Bangs Bickford & Kenneth R. Bowling eds.) (The Johns Hopkins Univ. Press, 2004) .............................. 17

Lloyd N. Cutler & David R. Johnson, *Regulation and the Political Process*, 84 Yale L.J. 1395 (1975) ................................ 19, 21

Nathan A. Sales & Jonathan H. Adler, *The Rest Is Silence: Chevron Deference, Agency Jurisdiction, and Statutory Silences*, 2009 U. Ill. L. Rev. 1497 (2009) ...................................... 31

Nicholas Quinn Rosenkranz, *The Objects of the Constitution*, 63 Stan. L. Rev. 1005 (2011) ......................................... 17

v

Philip Hamburger, *Delegation or Divesting*,
115 N.W. L. Rev. Online 88 (2020) ....................................................11

Richard Samp, *Good-Bye Morrison*, Law & Liberty (Sept. 7, 2021),
https://bit.ly/3YrIMx5.........................................................................27

S. 1902, 116th Cong. (June 19, 2019) ...................................................29

S. 3046, 114th Cong. (June 9, 2016) .....................................................29

S. 441, 117th Cong. (Feb. 25, 2021) ......................................................29

The Federalist 62 (James Madison)................................................28, 32

The Federalist No. 78 (Alexander Hamilton) .......................................11

*The Future of the Independent Counsel Act: Hearing Before the S.
Comm. on Gov't Affairs*, 116th Cong. 243 (1999)
(statement of Janet Reno, Att'y Gen. of the United States)...............26

*The Updated STURDY Act, Which Enjoys Popular and Extensive
Support, Will Help Protect Children from Furniture Tip-Overs*,
SGS (Oct. 18, 2022), https://bit.ly/3YJG7iy .......................................30

## Constitutional Provisions

U.S. Const. art. II ......................................................... 11, 12, 15, 16, 17

U.S. Const. pmbl..................................................................................18

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel states that *amicus curiae* New Civil Liberties Alliance is a nonprofit organization under the laws of the District of Columbia. It has no parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

/s/ Gregory Dolin
Gregory Dolin

## INTERESTS OF AMICUS CURIAE

The New Civil Liberties Alliance ("NCLA") is a nonpartisan, nonprofit civil-rights organization devoted to defending constitutional freedoms from the administrative state's depredations.[1] The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself: such as jury trial, due process of law, the right to live under laws made by the nation's elected lawmakers through constitutionally prescribed channels, and the right to have executive power exercised only by actors directed by the President, which is at stake in this appeal. Yet these selfsame rights are also very contemporary—and in dire need of renewed vindication—because Congress, federal administrative agencies, and even sometimes the courts have neglected them for so long.

NCLA aims to defend civil liberties—primarily by reasserting constitutional constraints on the administrative state. Although

---

[1] NCLA states that no counsel for a party authored this brief in whole or in part; and that no person or entity, other than NCLA and its counsel, made a monetary contribution intended to fund the preparation and submission of this brief.

Americans still enjoy the shell of their Republic, there has developed within it a very different sort of government—a type, in fact, that the Constitution was designed to prevent. This unconstitutional administrative state within the Constitution's United States is the focus of NCLA's concern.

NCLA is particularly disturbed by government officials not answerable to the President who are purportedly authorized by statute to usurp his Article II power to enforce the law. That usurpation is present here, where Congress has authorized the Commissioners of the Consumer Product Safety Commission ("CPSC" or "Commission") to exercise executive powers, including the power to commence litigation. But CPSC Commissioners may not be removed at will by the President. Because they are not subject to his at-will removal, the Commission may not exercise the executive power, period.

## STATEMENT OF THE CASE

CPSC is a United States agency charged with "protect[ing] the public against unreasonable risks of injury associated with consumer products." 15 U.S.C. §§ 2051(b)(1), 2053(a). It is comprised of five Commissioners appointed by the President and confirmed by the Senate.

*Id.* § 2053(a).   The Commission is empowered to broadly exercise executive powers, including the power to bring civil actions to enforce "laws subject to its jurisdiction."  *Id.* § 2076(b)(7)(a).  The Commissioners are not at-will appointees.   The President may only remove a Commissioner for cause; specifically, "for neglect of duty or malfeasance in office but for no other cause."  *Id.* § 2053(a).

Petitioners have filed this case on "behalf of their members, many of which are manufacturers, importers, or retailers of clothing-storage units subject to the Rule's requirements."  Pet. Br. at 1.  All petitioners have "worked with CPSC to develop voluntary furniture stability standards."  *Id.* at 2.

On November 25, 2022, CPSC promulgated a new rule entitled "Safety Standard for Clothing Storage Units."  87 Fed. Reg. 72,598 (Nov. 25, 2022).  The rule is directed at "clothing storage units" such as "chests, bureaus, dressers, chests of drawers, drawer chests, door chests, chifforobes, armoires, and wardrobes."  *Id.* at 72,598.  These items are extraordinarily popular with Americans who, according to CPSC's own estimates, own over 230 million of and spend at least $7 billion on these items annually.   *Id.* at 72,600.   In evaluating these products, the

3

Commission "determined that there is an unreasonable risk of injury and death, particularly to children, associated with clothing storage units (CSUs) tipping over," *id.* at 72,598, and as a result of this determination required either elimination or substantial changes to the most popular designs of these furniture items. CPSC itself acknowledges that at present, "nearly all CSUs [fail to] meet the standard" announced in the Rule. *Id.* at 72,658.

In recognition of the fact that almost none of the CSUs currently in use meet the newly announced standard, CPSC set the effective date of the rule to six months after promulgation or May 24, 2023. *Id.*

The Small Business Administration ("SBA")—an Executive Branch agency led by a Senate-confirmed, Cabinet-level official serving at the pleasure of the President—opposed the rule as written. *See* 87 Fed. Reg. at 72,654-72,655 (discussing *inter alia* SBA's comments on the proposed rule and noting SBA's opinion that "CPSC's Initial Regulatory Flexibility Act analysis underestimates the impact the proposed rule will have on small businesses" and that "CPSC should consider a later effective date for the rulemaking."). CPSC enacted the rule despite SBA's stated opposition.

4

Not only was the rule opposed by SBA, but in refusing to delay and reconsider the rule CPSC ignored a statute approved by Congress and signed into law by President Biden on December 29, 2022. *See* Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, Div. BB, Title II (2022) ("STURDY Act"). The STURDY Act requires CPSC to adopt the voluntary standard promulgated by ASTM International as its standard, *unless* CPSC determined that voluntary standard doesn't meet the STURDY Act's requirements. *See* STURDY Act § 201(c), (d). Instead of waiting to see whether the voluntary standard which the industry adopted in 2023, *see* ASTM F2057-23, actually met the statutory requirements, CPSC plowed ahead with its rule. Failure to evaluate whether a voluntary standard is sufficient to meet safety concerns is also contrary to the strictures of the Consumer Product Safety Act itself, because under that Act CPSC can only promulgate safety rules above and beyond voluntary standards (if such standards exist) when the standard is unlikely to be complied with or "compliance … is not likely to result in the elimination or adequate reduction of such risk of injury." 15 U.S.C. § 2058(f)(3)(D).

5

Petitioner challenged the rule on several grounds, including: (a) CPSC's failure to comply with the Consumer Product Safety Act, 15 U.S.C. § 2051 *et seq.*, (b) the rule was arbitrary, capricious, and unsupported by data, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and (c) CPSC's unconstitutional structure.

## ARGUMENT

Petitioner's argument that the "*Humphrey's Executor* exception does not apply because CPSC Commissioners exercise 'substantial executive power' without meaningful supervision," Pet. Br. at 51 (quoting *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2200 (2020)), is correct for two separate reasons—one focusing on the Constitution and the other concentrating more on precedent. To be precise, the Court should simultaneously reject *Humphrey's Executor* and follow it—for now.

**I.    *HUMPHREY'S EXECUTOR* WILL NEED TO BE RECONSIDERED: CPSC'S STRUCTURE IS UNCONSTITUTIONAL BECAUSE EXECUTIVE POWER CANNOT BE EXERCISED BY PERSONS PROTECTED FROM REMOVAL**

It is often said that administrative power resides not only in executive agencies but also independent agencies, which are independent in the sense that their heads are protected from Presidential removal and

6

control. But under the Constitution, the executive power "shall be vested" in the President, which includes the authority to remove subordinates, and this removal authority is essential if executive power is to be accountable. *See, e.g.*, *Seila Law*, 140 S. Ct. at 2211 ("In our constitutional system, the executive power belongs to the President, and that power generally includes the ability to supervise and remove the agents who wield executive power in his stead"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010) ("Since 1789, the Constitution has been understood to empower the President to keep … officers accountable—by removing them from office, if necessary."); *Fleming v. United States Dep't of Agric.*, 987 F.3d 1093, 1114 (D.C. Cir. 2021) (Rao, J., concurring-in-part and dissenting-in-part) ("Article II executive power necessarily includes the power to remove subordinate officers, because anything traditionally considered to be part of the executive power 'remained with the President' unless 'expressly taken away' by the Constitution.") (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789)). Vast growth in executive power makes it more important than ever before that such power be accountable through Presidential removal. *See Myers v. United States*, 272 U.S. 52, 134 (1926) ("The

7

imperative reasons requiring an unrestricted power [of the President] to remove the most important of his subordinates in their most important duties must therefore control the interpretation of the Constitution as to all appointed by him.").

Although this brief asks this court to follow *Humphrey's Executor* by holding CPSC's exercise of executive power unconstitutional, it also points out that the barriers to removal upheld by that case were themselves unconstitutional. In other words, CPSC's conduct regarding Petitioner is unconstitutional *both* because *Humphrey's* must be rejected and because it must be followed.

Because this court does not have the power, on its own authority, to overrule *Humphrey's*, *see State Oil v. Kahn*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."), it must rely on it in a way that will likely be upheld.

A.    *Removal Is Part of Executive Power and Is Unqualified*

Removal of subordinates is part of the President's executive power. *See Seila Law*, 140 S. Ct. at 2211; *Free Enter. Fund*, 561 U.S. at 483; *Myers*, 272 U.S. at 134. One might think it probative that the Constitution has a provision for appointments, but it says nothing about

8

removal. It is improbable, however, that the President lacks constitutional authority to remove subordinates. If the suggestion is that the Founders simply forgot to discuss the question, that is even less credible. Both appointments and removal, in fact, were part of the Constitution's executive power.

This inclusion of hiring and firing authority within executive power is significant because the Constitution later limits presidential appointments, but not removals. It thereby leaves the President unlimited in his authority to remove subordinates.

    1.   Executive Power Includes at Least the Execution of the Law

The President by himself cannot execute the law—so he necessarily must rely on a hierarchy of subordinates, whether officers or employees, to do most of the execution. *See Myers*, 272 U.S. at 117; *Cunningham v. Neagle*, 135 U.S. 1, 63-64 (1890). If such persons are essential for executing the law, then the Constitution "empower[s] the President to keep … [these] officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. As the Supreme Court explained, "[i]n our constitutional system, the executive power belongs to

9

the President, and that power generally includes the ability to supervise and remove the agents who wield executive power in his stead." *Seila Law*, 140 S. Ct. at 2211. If the President cannot remove those who execute the law, then he does not have the full scope of law-executing power—an essential part of his executive powers. Thus, faithfulness to the Vesting Clause of Article II requires recognizing the President's untrammeled authority to remove executive branch officials.

### 2. Executive Power More Generally Is the Action, Strength, or Force of the Nation

The "executive power" is much broader than merely the power to execute the laws. At the Founding it was understood as also including the nation's action, strength, or force. This more expansive foundation reinforces and broadens the conclusion that the President's "executive power" includes the authority to remove subordinates.

An understanding of executive power as the nation's action, strength, or force was a familiar concept at the time of the Founding. For example, Jean-Jacques Rousseau associated executive power with the society's "force," and Thomas Rutherforth defined it as the society's "joint strength." *See* Philip Hamburger, *Delegation or Divesting*, 115 N.W. L.

10

Rev. Online 88, 112 (2020).  As Alexander Hamilton understood and explained, the Constitution divides the government's powers into those of "force," "will," and "judgment"—that is, executive force, legislative will, and judicial judgment.  The Federalist No. 78 (Alexander Hamilton).

This vision of executive power included law enforcement but also much more.  Conceiving of the executive power in this way has the advantage of, for example, explaining the President's power in foreign policy, which cannot easily be understood as mere law enforcement.

That the Constitution adopted this broad vision of executive power is clear from its text—in particular, from the contrast between the President's "executive Power," U.S. Const. art. II, § 1, and his duty to "take Care that the Laws be faithfully executed," *id.*, § 3.  Article II then frames the President's authority in terms of *executive power*, not merely "executing the law."  The latter is merely a component of the former, which on one hand is limited by the requirement that the President "take Care that the Laws be faithfully executed," but also includes the "nation's action, strength, or force."

If the Constitution vests in the President the "nation's action, strength, or force," it follows that he must have sufficient authority to

remove people whom he views as undermining that strength or being insufficiently forceful.  The second foundation not only more accurately understands the President's executive power, but it also clarifies the breadth of the President's removal authority.   His law-executing authority reveals that he can hire and fire subordinates engaged in law enforcement; his executive power—understood more fully as the nation's action, strength or force—shows that he can hire and fire of all sorts of subordinates.[2] *See Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) ("The President must be able to remove not just officers who disobey his commands but also those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those who come from a competing political party who is dead set against the President's agenda, and those in whom he has simply lost confidence.") (cleaned up).

---

[2] To be sure, the Appointments Clause limits the President's power to hire Executive Branch officials.  U.S. Const. art. II, § 2, cl. 2.

### 3.    Whereas the Power of Appointment Is Qualified, the Power of Removal Is Not

Although the President's executive power includes hiring and firing authority, the Constitution treats them differently. Article II modifies and limits appointments power but leaves his removal power untouched.

That executive power was unqualified as to removals was spelled out in 1789 by Representative John Vining of Delaware:

> [T]here were no negative words in the Constitution to preclude the president from the exercise of this power, but there was a strong presumption that he was invested with it; because, it was declared, that all executive power should be vested in him, except in cases where it is otherwise qualified; as, for example, he could not fully exercise his executive power in making treaties, unless with the advice and consent of the Senate—the same in appointing to office.

John Vining (May 19, 1789), *in* 10 Documentary History of the First Federal Congress 728 (Charlene Bangs Bickford, *et al.*, eds.) (The Johns Hopkins Univ. Press, 1992).

James Madison was equally emphatic, writing:

> The legislature creates the office, defines the powers, limits its duration, and annexes a compensation. This done, the legislative power ceases. They ought to have nothing to do with designating the man to fill the office. That I conceive to be of an executive nature. ... The nature

13

> of things restrains and confines the legislative and executive authorities in this respect; and hence it is that the constitution stipulates for the independence of each branch of the government.

James Madison (June 22, 1789), *in* 11 Documentary History of the First Federal Congress 1032 (Charlene Bangs Bickford, *et al.*, eds.) (The Johns Hopkins Univ. Press, 1992). Madison rejected the argument that limits on Presidential appointments implied similar limits on removals, writing that although the power of appointment "be qualified in the constitution, I would not extend or strain that qualification beyond the limits precisely fixed for it." *Id.*

The First Congress adopted these views. Thus, in 1789, when the first Congress considered a statutory limit on the President's removal authority it, in what has since then been referred to as "The Decision of 1789," refused to adopt it. But this label is a misnomer. It misleadingly suggests that the Constitution had nothing to say on the question and that the President's removal authority was merely a congressional decision—as if removal rests merely on a political precedent. In fact, the Constitution's text establishes the president's removal authority by vesting executive power in him without limiting it in respect to his power

14

to remove subordinates.  The 1789 debate is merely further evidence of the decision already made in the Constitution.[3]

In short, at the time of the Founding it was clearly understood that the President's removal power is different from and stands in contrast to his power of appointments.  Although both powers are part of the "executive power," the latter was substantially qualified, whereas the former remained absolute and unqualified.

   4. The President's Removal Authority Is Confirmed by His Duty "to take Care that the Laws be faithfully executed"

The President's removal authority is reinforced by his duty to "take Care that the Laws be faithfully executed."  U.S. Const. art II, § 3.  The President of course may, and indeed has no choice but to delegate much of his *authority* to carry the laws into execution to subordinates.  *See Myers*, 272 U.S. at 117; *Cunningham*, 135 U.S. at 63-64.  At the same time, his *duty* "to take Care that the Laws be faithfully executed" is non-delegable, and he remains exclusively responsible for this function of the

---

[3] According to the Supreme Court, "Since 1789, the Constitution has been understood to empower the President to keep [his] officers accountable—by removing them from office, if necessary." *Free Enter. Fund*, 561 U.S. at 483. "Since *1787 …*" would be even more accurate.

15

Government.  It therefore follows that the President must have the power to remove individuals who, in his view, do not help him fulfill, or worse yet, undermine his duty of faithful execution of the Nation's laws.  The threat of removal is the only way that the President can exercise control over his subordinates and ensure that through *their* action or inaction, *he* does not fail in *his* duty.  "[T]o hold otherwise would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed."  *Myers*, 272 U.S. at 164 (quoted in *Free Enter. Fund*, 561 U.S. at 492; and in *Seila Law*, 140 S. Ct. at 2197).

The exercise of executive power takes many forms, from filing a lawsuit to conducting administrative proceedings.  *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) ("A lawsuit is the ultimate remedy for a breach of the law, and it is to the President … that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'") (quoting U.S. Const. art. II, § 3); *Seila Law*, 140 S. Ct. at 2198 n.2 ("[A]gency adjudication 'must be' an exercise of executive authority.") (quoting *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013)).  The Take Care Clause underlines and confirms that the President's executive

16

power includes a discretionary authority to remove officials who exercise his authority under that Clause.

> B.    *It Is Constitutionally Intolerable for an Executive Branch Agency to Defy Presidential Policy Preferences*

The Constitution vests all executive power in a single person. U.S. Const. art. II, § 3. "Every executive official is merely exercising the President's power, and it is ultimately the President's personal responsibility to 'take Care that the Laws be faithfully executed.'" Nicholas Quinn Rosenkranz, *The Objects of the Constitution*, 63 Stan. L. Rev. 1005, 1038 (2011) (quoting *id.*). While the Constitution permits and expects the President to delegate his authority to subordinates (*see, e.g.*, 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939); *Free Enter. Fund*, 561 U.S. at 492), our founding document structured the executive power in such a way as to maintain "the requisite responsibility and harmony in the Executive Department," Letter from James Madison to Thomas Jefferson (June 30, 1789), *in* 16 Documentary History of the First Federal Congress 893 (Charlene Bangs Bickford & Kenneth R. Bowling eds.) (The Johns Hopkins Univ. Press, 2004). The only way to ensure such "responsibility and harmony" is to ensure that the party

17

actually accountable to the nation's voters serves as an ultimate decisionmaker. It is for this reason that then-Judge Kavanaugh wrote, in *SEC v. Fed. Lab. Rels. Auth.*, a system that "pit[s] two agencies in the Executive Branch against one another" is a "constitutional oddity." 568 F.3d 990, 996 (D.C. Cir. 2009) (Kavanaugh, J., concurring). That puts the point rather mildly. A situation where the only person who is actually vested with the "Executive Power" is unable to resolve a dispute between two Executive Branch agencies is not a merely a "constitutional oddity," but a direct affront to the Constitution as properly construed.

As our Founding Fathers wrote more than two centuries ago, "Governments [which] are instituted among Men[] deriv[e] their just powers from the consent of the governed." Declaration of Independence, ¶2; *see also* U.S. Const. pmbl.. "[T]he true principle of a republic is, that the people should choose whom they please to govern them." *Powell v. McCormack*, 395 U.S. 486, 540-41 (1969) (quoting 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876)). This means that statutes derive their political legitimacy from "the fact that in a democracy the people may vote out politicians whose acts displease them[] and elect new representatives who promise change." *David B. v. McDonald*, 116 F.3d

18

1146, 1150 (7th Cir. 1997).  Regulatory actions are in no less need of political legitimacy than statutes are.  Much like statutes, these actions derive their legitimacy from the legitimacy conferred upon the President by the results of quadrennial plebiscite.  In contrast, "[r]egulatory 'failure' … occurs when an agency has not done what elected officials would have done had they exercised the power conferred on them by virtue of their ultimate political responsibility."  Lloyd N. Cutler & David R. Johnson, *Regulation and the Political Process*, 84 Yale L.J. 1395, 1399 (1975).  In other words, an agency fails both politically and more importantly constitutionally when it "reach[es] substantive policy decisions (including decisions not to act) that do not coincide with what the politically accountable branches of government would have done if they had possessed the time, the information, and the will to make such decisions."  *Id.*  This is precisely what happened here.

SBA is directly responsible to the politically accountable President because an Administrator who is removable at will runs it.  When the President, who is attuned to the needs of the electorate because either he, or his political compatriot, will at any given time be just a few months away from facing the public's judgment, is displeased with the actions of

19

the SBA Administrator, he will dismiss the Administrator from his position.  The ability of the President to dismiss the Administrator is the most potent tool to ensure that SBA hews closely to the President's preferred policy.  In the present case, although President Biden did not personally sign SBA's letters to CPSC, because he does exercise direct control over SBA, it is safe to assume that the opposition to the Rule generally and the six-months implementation period specifically is the Administration's official policy.  If the President made an incorrect choice and as a result of a delay in implementing the Rule more children will be injured (as CPSC suspects), then the voters will have an opportunity to hold the President accountable for such callousness at the next election.  On the other hand, if the President is correct that the harm to the industry is not outweighed by the marginal improvement to the likelihood of injury, then the voters will have an opportunity to reward such far-sightedness.

CPSC, however, ignored the President's preferred policy choice and instead substituted its own.  CPSC "has not done what elected officials would have done had they exercised the power conferred on them by virtue of their ultimate political responsibility."  Cutler & Johnson,

*supra.* The Commission "reach[ed] substantive policy decisions … that do not coincide with what the politically accountable branches of government [wished to] have done," *id.*, and as a result it not only undermined the President's ability to "take Care that the Laws be faithfully executed," but the public's ability to render judgment on the President's decisions.

The Constitution, which is wholly predicated on the ability of "We the People" to give assent to, and render political judgment about, the laws that are to govern us, cannot tolerate a system where such abilities are withdrawn from the citizenry. An agency like CPSC whose very structure ensures that its policy determinations are insulated from Presidential, and therefore popular review, cannot exist within our Constitutional structure.

###### C.    *Humphrey's Executor Needs to Be Reconsidered*

It ultimately will be necessary to reconsider the holding of *Humphrey's Executor*, which upheld the constitutionality of the Federal Trade Commission ("FTC") Commissioners' tenure protections. It is important to remember that *Humphrey's* did not dispute the President's executive power to remove Executive Branch subordinates; to the

21

contrary, *Humphrey's* was predicated on the fact that the FTC did not exercise "executive power." *See* 295 U.S. 602,628 (1935) ("[T]he commission acts in part quasi legislatively and in part quasi judicially … [and] [t]o the extent that it exercises any executive function, as distinguished from executive power in the constitutional sense, it does so … as an agency of the legislative or judicial departments of the government."). However, FTC in 1935 in fact exercised "executive power in the constitutional sense[,]" and it certainly does so now. Thus, *Humphrey's Executor* was and is mistaken. *See Seila Law*, 140 S. Ct. at 2198 n.2. Therefore, it will ultimately have to be overruled.

## II. IF *HUMPHREY'S EXECUTOR* MUST BE FOLLOWED, CPSC'S ACTIONS IN PROMULGATING THE CHALLENGED RULE ARE UNCONSTITUTIONAL BECAUSE *HUMPHREY'S* BARS THE AGENCY FROM EXERCISING EXECUTIVE POWER

Although CPSC's action is unlawful because *Humphrey's* should be overruled, even if this Court follows *Humphrey's* to the letter, it must still reach the same conclusion—*i.e.*, that CPSC's action is unlawful. And this Court can modestly follow *Humphrey's* by holding as much—confident that even if the Supreme Court rejects that precedent, this Court's judgment will be upheld.

A.   *Humphrey's Executor Forbids CPSC from Exercising Executive Power*

CPSC's promulgation of the rule in question is unlawful under *Humphrey's Executor* because that case held that FTC Commissioners can enjoy tenure protection only because FTC does not exercise executive power.  295 U.S. at 628.

The Court in *Humphrey's* did not doubt the President's power to terminate the employment of an executive officer.  In fact, the Court characterized the President's Article II power to terminate as "exclusive and illimitable."  *Id.* at 627.

In other words, the Court assumed that FTC brought enforcement actions only in its own, internal adjudications, not in Article III courts. It thought such internal enforcement could be viewed as derivative of FTC's quasi-legislative and quasi-judicial powers.  But it thereby drew a sharp contrast.  Whereas FTC enforcement within the agency was not "executive power in the constitutional sense," FTC enforcement outside the agency, in Article III courts, would be "executive power in the constitutional sense."  *Id.* at 628.

23

The Commission exercises substantial executive power in the constitutional sense.

> Similar to the [Consumer Financial Protection] Bureau in *Seila Law*, the Commission "may promulgate consumer product safety standards" affecting a wide range of consumer products on the market. 15 U.S.C. § 2056(a); *Seila Law*, 140 S. Ct. at 2200 (noting the Bureau's "authority to promulgate binding rules fleshing out 19 federal statutes."). And just as the Bureau had the power to regulate certain practices across a segment of the U.S. economy, the Commission has the authority to "promulgate a rule" banning products nationwide as "hazardous." 15 U.S.C. § 2057; *see also* 140 S. Ct. at 2200 (noting a broad power to issue "prohibition on unfair and deceptive practices in a major segment of the U.S. economy"). …

> The Commission also holds the power to "unilaterally issue final decisions awarding legal and equitable relief in administrative adjudications." *See* 140 S. Ct. at 2200. Indeed, the Commission "by one or more of its members" may "conduct any hearing or other inquiry necessary or appropriate to its functions anywhere in the United States." 15 U.S.C. § 2076(a); see also 16 C.F.R. § 1025.1 (establishing rules for adjudication). …

> Finally, the Commission holds the "quintessentially executive power not considered in *Humphrey's Executor*" to file suit in federal court "to seek daunting monetary penalties against private parties" as a means of enforcement. *Seila Law*, 140 S. Ct. at 2200; *see also* 15 U.S.C. § 2076(b)(7)(A) (authorizing the Commission to initiate and prosecute civil actions). Each violation of the

24

Commission's rules carries "a civil penalty not to exceed $100,000," up to a total of $15 million for all related violations, with the ability to adjust for inflation. 15 U.S.C. § 2069(a)(1); (a)(3)(A). The Commission may also bring actions for injunctive enforcement in district court. *Id.* § 2071(a). And the Commission can initiate and prosecute criminal actions "with the concurrence of the Attorney General." *Id.* § 2076(b)(7)(B). Finally, the Commission has the power to issue subpoenas, see *id.* § 2076(b)(3), an additional executive power recognized in *Collins*. *See* 141 S. Ct. at 1786.

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 592 F. Supp. 3d 568, 584 (E.D. Tex. 2022), *appeal filed*, No. 22-40328 (5th Cir. May 18, 2022).

Given the powers it possesses, CPSC cannot claim that it exercises anything other than executive power. And because CPSC cannot dispute that the powers it holds are "executive," it does not try to do so. *See, e.g.*, *id.* (noting that "[t]he Government does not dispute that [Commission possesses] executive powers").

CPSC cannot have it both ways. Per *Humphrey's Executor*, the CPSC's structure of Commissioners not removable by the President would be constitutional only if the Commissioners did *not* exercise

25

executive power.   If they do exercise executive power, *Humphrey's Executor* does not protect them from at-will removal by the President.[4]

---

[4] Only two cases other than *Humphrey's Executor* have upheld statutory limits on Presidential removal. *See Morrison v. Olson*, 487 U.S. 654 (1988); *Wiener v. United States*, 357 U.S. 349 (1958). Neither, however, assists the CPSC.

*Wiener* concerned the War Claims Commission, which possessed no executive powers, instead being "established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof." 357 U.S. at 345-55. Furthermore, as the War Claims Commission was processing claims that were to be paid by the United States and out of the federal treasury, *see* 50 U.S.C. § 4143, the Commission was essentially an Article I tribunal similar to the long-established and long-accepted Court of Claims.   *Cf. Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 283 (1855) ("It is equally clear that the United States may consent to be sued, and may yield this consent upon such terms and under such restrictions as it may think just.").

*Morrison* also offers no help to CPSC's position.   That case involved the unique problem of an independent counsel, who was viewed by the Court (correctly or not) as an "inferior officer," in contrast to CPSC Commissioners who are indisputably "principal officers."   Thus, the *Morrison* "exception" cannot be relied on here.   Additionally, *Morrison* has been so widely and prominently questioned that it is not clear it can *ever* be relied upon—even as to its own facts. *See, e.g.*, *Justice Kagan and Judges Srinivasan and Kethledge Offer Views from the Bench*, 92 Stan. Law. In Brief (2015), https://stanford.io/3qw1UuM   ("Kagan called Supreme Court Justice Antonin Scalia's lone dissent in *Morrison* … 'one of the greatest dissents ever written and every year it gets better.'"); *The Future of the Independent Counsel Act: Hearing Before the S. Comm. on Gov't Affairs*, 116th Cong. 243 (1999) (statement of Janet Reno, Att'y Gen. of the United States) ("[T]he Independent Counsel Act is structurally flawed and … [these] flaws cannot be corrected within our

26

B.    *This Court Has a Duty to Follow Precedent Faithfully*

This Court must follow both the Constitution and Supreme Court precedent.    Although precedents, such as *Humphrey's Executor*, sometimes stray from the Constitution, in this instance the Court is fortunate that the Constitution whether applied as properly understood, *see ante* § I, or as applied too abstemiously in *Humphrey's*, leads to the same conclusion—the CPSC is unconstitutionally structured.

This Court therefore should follow both the Constitution and the precedent, resting its decision on the latter.

First, in following the Constitution, it should note that *Humphrey's* is probably mistaken, because the President enjoys constitutional authority to dismiss any other person exercising executive power. *See ante*, § I.

Second, in following precedent, this Court should hold that under *Humphrey's Executor*, the CPSC cannot exercise executive power because its Commissioners are shielded from executive removal.

---

constitutional framework."). *See also* Richard Samp, *Good-Bye Morrison*, Law & Liberty (Sept. 7, 2021), https://bit.ly/3YrIMx5 (arguing that the Supreme Court *sub silentio* overruled *Morrison* in *United States v. Arthrex*, 141 S.Ct. 1970 (2021)).

27

### III. CPSC'S DEFIANCE OF A CONTEMPORANEOUS STATUTE VIOLATES THE NON-DELEGATION DOCTRINE

Under our system, for any proposal "to become law" it must secure "the agreement of both Congress and the President (or, a supermajority in Congress)." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv.*, 140 S. Ct. 1649, 1656 (2020) (Alito, J., concurring). "The Constitution's deliberative process was viewed by the Framers as a valuable feature, not something to be lamented and evaded." *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015). The Founders created this "cumbersome" system for a reason—they feared that making legislation too easy to enact would lead to political instability and loss of liberty itself. *See, e.g.*, The Federalist 62 (James Madison) ("It will be of little avail to the people, that the laws are made by men of their own choice, … if they be repealed or revised before they are promulgated, or undergo such incessant changes that no man, who knows what the law is to-day, can guess what it will be to-morrow.").[5] An obvious corollary to the Framers' concern is the assurance that a proposal managing to

---

[5] Of course, in cases of "independent agencies" the legally binding rules are not even made "by men of [the people's] own choice."

navigate through both the House and the Senate, and following that meet with the President's approval, is likely to be in the broad interest of society at large and less likely to be oppressive. *See, e.g.*, *Brett M. Kavanaugh, Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907, 1910 (2014) ("Legislation that attained broad support was less likely to be oppressive—to unfairly benefit one faction at the expense of another.").

Here, Congress negotiated and eventually enacted legislation dealing with the specific problem that CPSC tried to address. The Act was subject to long Congressional deliberation and evaluation. The bill that ultimately became the STURDY Act was introduced in the 114th, 116th, and 117th Congresses, but each time failed to pass.[6] Eventually, a modified version of the bill was introduced in the Senate which was eventually enacted as part of the Consolidated Appropriations Act of 2023. *See* Pub. L. No. 117-328, Div. BB, Title II . Unlike the unsuccessful

---

[6] *See* S. 3046, 114th Cong. (June 9, 2016); H.R. 5442, 114th Cong. (June 9, 2016); S. 1902, 116th Cong. (June 19, 2019); H.R. 2211, 116th Cong. (Sept. 18, 2019); S. 441, 117th Cong. (Feb. 25, 2021); and H.R. 1314, 117th Cong. (June 24, 2021).

versions of the bill, the enacted version directed "CPSC to adopt ASTM International F2057—the voluntary furniture stability standard—as the mandatory standard required by STURDY, as long as F2057 is updated to meet all of the performance requirements outlined in STURDY." *The Updated STURDY Act, Which Enjoys Popular and Extensive Support, Will Help Protect Children from Furniture Tip-Overs*, SGS (Oct. 18, 2022), https://bit.ly/3YJG7iy . This provision was "the result of the collaborative efforts of several stakeholders from industry manufacturers and retailers ...." *Id.* The legislative process was slow, deliberative, and collaborative, *i.e.*, exactly as the Framers designed.

Problematically, CPSC took no heed of this process or the resulting considered judgment of the people's elected representatives.  Current Supreme Court precedent permits Congress to delegate legislative power to the Executive Branch only if it "place[s] constitutionally adequate 'limits on the [agency's] discretion.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (quoting *Whitman v. American Trucking Assns.*, 531 U.S. 457, 473 (2001)).  These limits are needed to ensure that ultimately it is the politically answerable Congress that exercises overall control over the Nation's policy.  *See* Nathan A. Sales & Jonathan H. Adler, *The*

30

*Rest Is Silence: Chevron Deference, Agency Jurisdiction, and Statutory Silences*, 2009 U. Ill. L. Rev. 1497, 1545 (2009) ("[I]nsofar as agencies are politically accountable, it is often a consequence of legislative oversight and control.").

In some sense, this case is similar to *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), except CPSC is acting even more brazenly here than FDA did in that case. In *Brown & Williamson*, the Court explained that FDA had no authority to regulate tobacco products in part because Congress consistently denied such authority to that agency. *Id.* at 156 ("Congress has persistently acted to preclude a meaningful role for *any* administrative agency in making policy on the subject of tobacco and health.") (emphasis in original). Yet, there the Court faced mostly Congressional *silence* as Congress merely failed to pass bills that would authorize FDA to regulate tobacco instead of affirmatively giving FDA specific directions. Here, Congress was not merely silent about CPSC's ability to regulate CSUs, but explicitly limited the agency's discretion as to the type and scope of regulation to be adopted. When CPSC ignored those limits, it exceeded the limits of its delegated authority both as a statutory and constitutional matter.

31

Were an agency permitted to behave in this manner, it would undermine the system of deliberative legislative process which is essential to liberty and self-government. *See* The Federalist 62, *supra.*

## CONCLUSION

Because the CPSC Commissioners exercise executive power and are not removable at will by the President, the Commission is structured unconstitutionally. Additionally, CPSC's exercise of legislative functions in a way that ignores direct Congressional mandates violates the constitutional constraints on the delegation of legislative authority to the Executive Branch agencies.

Because an unconstitutionally structured body cannot wield any powers until the structural defect is rectified, and because no Executive Branch official or body can act in defiance of or exercise powers beyond those granted a duly enacted statute, the challenged rule should be vacated.

Respectfully submitted,

/s/ Gregory Dolin
Gregory Dolin
    *Counsel of Record*
John J. Vecchione
Mark Chenoweth
Philip Hamburger
NEW CIVIL LIBERTIES ALLIANCE
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
greg.dolin@ncla.legal

Dated: February 16, 2023

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 6,412 words. This brief also complies with the typeface and type-style requirements of the Federal Rule of Appellate Procedure because it was prepared using Microsoft Word 2016 in Century Schoolbook 14-point font, a proportionally spaced typeface.

/s/ Gregory Dolin
Gregory Dolin

# CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ Gregory Dolin
Gregory Dolin