No. 22-60639

# In the United States Court of Appeals for the Fifth Circuit

AMERICAN HOME FURNISHINGS ALLIANCE; MISSISSIPPI ECONOMIC COUNCIL; MISSISSIPPI MANUFACTURERS ASSOCIATION,

*Petitioners,*

*v.*

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,

*Respondent.*

On Petition for Review of a Final Rule of
The United States Consumer Products Safety Commission

**BRIEF OF AMICI CURIAE
NORTH AMERICAN HOME FURNISHINGS ASSOCIATION;
NATIONAL RETAIL FEDERATION; BRAKENRIDGE FURNITURE
COMPANY; MISKELLY FURNITURE, PEARL; MISKELLY
FURNITURE, MADISON; MISKELLY FURNITURE, HATTIESBURG;
MISKELLY CLEARANCESTORE; MISKELLY ROOMSTORE,
IN SUPPORT OF PETITIONERS**

Susanna R. Allen
Shayna M. Goldblatt
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

**Attorneys for Amici Curiae**

## Certificate of Interested Persons

No. 22-60639

American Home Furnishings Alliance; Mississippi Economic Council;
Mississippi Manufacturers Association,
Petitioners,

*v.*

United States Consumer Product Safety Commission,
Respondent.

The undersigned counsel of record certifies that the following listed persons

and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest

in the outcome of this case. These representations are made in order that the judges

of this Court may evaluate their possible recusal or disqualification:

1.    Petitioners American Home Furnishings Alliance; Mississippi

Economic Council; Mississippi Manufacturers Association, represented in the Fifth

Circuit by:

> Sarah M. Harris
> Whitney D. Hermandorfer
> Mark S. Storslee
> Clayton P. Phillips
> Libby A. Baird
> Ikenna N. Ugboaja
> Williams & Connolly LLP
> 680 Main Avenue SW
> Washington, DC 20024
> whermandorfer@wc.com

2.　　Respondent United States Consumer Product Safety Commission, represented in the Fifth Circuit by:

> Merrick Garland
>　*United States Attorney General*
> Alexander K. Haas
>　*Director*
> Brian M. Boynton
>　*Principal Deputy Assistant Attorney General*
> Mark B. Stern
> Courtney L. Dixon
>　*Attorneys, Appellate Staff Civil Division*
> United States Department of Justice
> 950 Pennsylvania Avenue NW
> Washington, DC 20530
>
> Alberta E. Mills
> United States Consumer Product Safety Commission
> 4330 E. West Highway
> Bethesda, Maryland 20814

3.　　Amici Curiae in support of Petitioners North American Home Furnishings Association; National Retail Federation; Brakenridge Furniture Company; Miskelly Furniture, Pearl; Miskelly Furniture, Madison; Miskelly Furniture, Hattiesburg; Miskelly Clearancestore; Miskelly Roomstore represented in the Fifth Circuit by:

> Susanna R. Allen
> Shayna M. Goldblatt
> YETTER COLEMAN LLP
> 811 Main Street, Suite 4100
> Houston, Texas 77002
> (713) 632-8000

/s/Susanna R. Allen

Susanna R. Allen
*Attorney of record for Amici Curiae*

# TABLE OF CONTENTS

PAGE

Certificate of Interested Persons ................................................................ 2

Table of Authorities .................................................................................... 6

Interest of Amici Curiae ............................................................................. 8

Summary of the Argument ......................................................................... 10

Argument .................................................................................................... 12

I.   Conflicting Rules Undermine Compliance Ability and Consumer
     Safety. ................................................................................................. 12

II.  The Agency Failed to Consider Significant Sources of Increased Costs
     to Retailers and, Ultimately, to Consumers. ..................................... 15

     A.   Mixing Compliant and Non-Compliant Inventory ............................ 16

     B.   Weight Increases ............................................................................. 18

     C.   Employee Training ........................................................................... 20

     D.   Online Hangtag Confusion .............................................................. 22

III. Increased Costs Will Make Serving Customers and Staying in
     Business Much Harder for Retailers. .................................................. 24

Conclusion .................................................................................................. 27

Certificate of Conference ........................................................................... 30

Certificate of Service .................................................................................. 31

Certificate of Compliance ........................................................................... 32

# TABLE OF AUTHORITIES

PAGE(S)

## STATUTES, REGULATION, AND RULE

15 U.S.C. § 2058(f)(3)(E) ........................................................15

16 C.F.R. § 1261.6(b) ...................................................... 22, 23

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (2022).................... 13

Fed. R. App. P. 29(a) ............................................................. 8

## REGULATORY MATERIALS

Final Rule Briefing Package, Consumer Prod. Safety Comm'n,
https://tinyurl.com/ysf99u3d .................................................. 20, 22

North American Home Furnishings Association 4/6/22 cmt., Tab 7,
CPSC-2017-0044-0089............................................. 13, 16, 18, 21, 26

North American Home Furnishings Association 4/19/22 cmt., CPSC-
2017-0044-0106 ...............................................................13, 14, 16, 20

National Retail Federation 10/18/22 cmt., CPSC-2017-0044-0124 .................16, 25

Rulemaking Comments, https://www.regulations.gov/docket/CPSC-
2017-0044/comments ............................................................ 8

Rulemaking Docket, https://www.regulations.gov/docket/CPSC-
2017-0044 ..................................................................... 8

U.S. Small Business Administration 4/18/22 cmt., CPSC-2017-0044-
0104 ........................................................................19, 24

## OTHER AUTHORITIES

HFA Letter to Congress (Feb. 1, 2023),
https://tinyurl.com/5n8pmx8w ................................................. 14

U.S. Census Bureau, https://tinyurl.com/2kusyrx7 (Natchez,
Mississippi)...................................................................... 26

U.S. Census Bureau, https://tinyurl.com/2p92vfj4 (Pearl, Mississippi) ......................................................................................... 26

U.S. Census Bureau, https://tinyurl. com/5bk7u5kk (Madison, Mississippi) ......................................................................................... 26

U.S. Census Bureau, https://tinyurl.com/yc7yyhdn (Hattiesburg, Mississippi) ......................................................................................... 26

U.S. Census Bureau, https://tinyurl. com/yswa7s8x (Ferriday, Louisiana) ............................................................................................ 26

### INTEREST OF AMICI CURIAE[1]

Amici Curiae represent the interests and concerns of furniture retailers across Texas, Mississippi, and Louisiana as well as national retail industry groups (together, Retailers) in challenging a final rule promulgated by the U.S. Consumer Product Safety Commission. Together, Retailers aim to give the Court important retail-specific information that the rulemaking minimized or excluded.[2]

***North American Home Furnishings Association (HFA)***. HFA is the nation's only trade association devoted exclusively to home furnishings retailers. HFA's 1,550 members represent over 8,000 retail storefronts. Of those, 155 member retailers operate 363 storefronts in Mississippi, Louisiana, and Texas. HFA captures every segment of the industry; however, the majority of its members, like the majority of the furniture retail industry, are small businesses—99%. HFA promotes retailers' interests through many avenues and provides resources to help retailers

---

[1]    This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the consent of all parties. Undersigned counsel for Amici Curiae certify that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for preparing or submitting the brief; and no person other than Amici and their counsel contributed money for the preparation or submission of this brief.

[2]    The rulemaking docket is available at https://www.regulations.gov/docket/CPSC-2017-0044. Within that docket, all comments are searchable by Comment ID (CPSC-2017-0044-XXXX) at https://www.regulations.gov/docket/CPSC-2017-0044/comments.

grow their businesses, satisfy their customers, and stay abreast of important policy developments.

*National Retail Federation (NRF).* NRF is the world's largest retail trade association. For over a century, NRF has been a voice for every retailer and every retail job, educating, inspiring, and communicating the powerful impact retail has on local communities and global economies. Retail is the nation's largest private-sector employer, contributing $3.9 trillion to annual GDP and supporting one in four U.S. jobs—52 million Americans. NRF's membership includes retailers of all sizes, formats, and channels of distribution.

*Brakenridge Furniture.* Locally owned Brakenridge Furniture Company has stores in the cross-border communities of Natchez, Mississippi, and Ferriday, Louisiana. It was founded by current owner Anna Brakenridge Ferguson's father, Gene Brakenridge, in 1961. Anna took over the business in 2017, and since then, she has worked hard to lead the stores and continue her father's legacy of contributing to the community. Between the two stores, only miles apart, Brakenridge Furniture employs around 15 workers. Brakenridge Furniture is a member of HFA and won HFA's 2019 Retailer of the Year Award for stores with less than 50 employees.

*Miskelly Furniture.* In 1978, three brothers—Oscar, Chip, and Tommy Miskelly—opened a furniture store in Pearl, Mississippi. Today, their family-owned

business is a household name across the state, with Miskelly Furniture, Pearl; Miskelly Furniture, Madison; Miskelly Furniture, Hattiesburg; Miskelly Clearancestore; and Miskelly Roomstore (collectively, Miskelly Furniture). Three of Oscar's children have joined the business, as has Tommy's daughter. A true family business, Miskelly Furniture's mission statement is "[o]ur family serving your family with excellence." Miskelly Furniture has 340 team members and over 240,000 square feet of showroom space. Miskelly Furniture is a member of HFA.

## SUMMARY OF THE ARGUMENT

To follow the stakeholder-driven path to consumer safety, Retailers support Petitioners' request to set aside the CPSC's rule in its entirety or, alternatively, vacate and remand the rule for further review. Retailers also support Petitioners' request to stay the rule pending this Court's review.

Collectively, Retailers buy, market, sell, and deliver thousands of clothing-storage units per year. As the final arm in the retail chain, Retailers interact directly with customers—operating showrooms, providing design input, and delivering furniture to their homes.

For these small, often family-owned businesses, customer safety is personal. Their customers are typically friends, relatives, and neighbors. Safety also makes business sense: selling safe products allows retailers to build trust with customers.

To that end, Retailers have spent over a decade focused on making clothing-storage units (CSUs) safe for children by implementing voluntary safety standards and pushing to make that standard law. These efforts culminated in the recent passage and signing into law of the STURDY Act. Meanwhile, the agency promulgated a conflicting final rule that marks a sea change from the widely used voluntary standards. And so, without the Court's intervention, the new rule will govern in less than three months, even though the voluntary standard likely will ultimately replace it months after that. For retailers, this conflict creates chaos and brings business planning to a grinding halt as they must prepare for dual-track compliance.

The new rule will impose significant additional costs on retailers that the agency did not adequately consider. Retailers will disproportionately bear the increased compliance costs from manufacturers via wholesale price increases—a fact the agency acknowledges. But there are retailer-specific costs beyond these that the agency either under-valued or failed to take into account. These include costs associated with mixed inventory, additional weight, hangtag training, and website expenses. The agency's cost analysis used a manufacturer-focused lens and did not give these costs due consideration in the rulemaking.

Finally, even for the costs that the agency considered, its explanation seems to be "pass it on in consumer markup." But nowhere does the agency meaningfully engage with what that really means—hand the bill to retailers. Retailers have fought hard to weather years of unprecedented challenges from the pandemic, rising costs, and widespread supply chain disruptions. Now, in the face of already rising inflation, they are on the precipice of having to pass on to their customers the increased costs that the *entire furniture industry* incurs from complying with the agency's new rule. To Retailers, the new costs will require drastic cost cuts and growth paralysis just to keep doors open and avoid alienating their customers.

Setting aside the rule or, alternatively, vacating and remanding it for further review, would spare Retailers from disastrous consequences while prioritizing child safety. And staying the rule pending judicial review would prevent the inefficiencies and confusion that the dual-track compliance regime creates.

## ARGUMENT

## I.    Conflicting Rules Undermine Compliance Ability and Consumer Safety.

The retail industry has implemented voluntary safety standards and has pushed for a mandatory standard for CSUs for over a decade, with child safety at the forefront. With those goals, the furniture industry has worked tirelessly to implement voluntary standards and joined parent and consumer groups, safety

advocates, and testing labs to help craft a mandatory standard. These efforts culminated in passage and signing of the STURDY Act.[3]

Through the STURDY Act, Congress expressly telegraphed its preference for stakeholder-driven standards to address clothing-storage-unit safety. The Act's plain text reflects a deliberate, practical choice in acknowledging that "exist[ing]" voluntary standards—carefully crafted by stakeholders—could avoid the need for normal agency rulemaking, altogether. *Id.* § 201(d). With STURDY, Congress directed the Consumer Product Safety Commission (the agency) to consider whether a qualifying voluntary standard, developed by ASTM International (or a similar entity), could meet the Act's requirements. *Id.* § 201(c)(1)–(2). If so, the agency "shall" adopt the voluntary standard as its own and that voluntary standard "will supersede *any other*" existing standard. *Id.* § 201(d) (emphasis added).

After years of collaborative, safety minded cooperation,[4] ASTM F2057-23— an existing (and newly revised) voluntary standard—marries stakeholder input to the pressing needs of child safety. As HFA explains in a recent letter to Congress,

---

[3]  Consolidated Appropriations Act, 2023, Pub. L. No. 117-328 (2022) (STURDY).

[4]  This sort of safety-driven consensus is not new. HFA and many others in the furniture industry have long advocated for making the voluntary standards mandatory and even partnered with the agency on its "Anchor It" campaign. HFA 4/6/22 cmt. 1, Tab 7, CPSC-2017-0044-0089; HFA 4/19/22 cmt. 1, CPSC-2017-0044-0106.

"[e]veryone concerned about child safety was at the table and signed off." HFA Letter to Congress (Feb. 1, 2023), https://tinyurl.com/5n8pmx8w.

Despite that broad consensus for a clear path to child safety, the agency opted to issue a final rule that uses standards and testing unfamiliar to the industry and that may only be operative for a matter of months.

As manufacturers work diligently to comply with the new rule and the anticipated new-new rule as a result of STURDY, Retailers are left in limbo. To understand why, start with the retail business model. Retailers typically source inventory from manufacturers. This retailer-manufacturer relationship means that retailers must navigate and try to plan their businesses around the supply chain's unpredictability. Retailers "consistently report 9–12 month timelines from order to production to delivery of products to customers." *See* HFA 4/19/22 cmt. 1. Now, add in time for manufacturers to try to comply. Twice. And now add in more time for retailers to understand and implement their own compliance. Twice. With all inventory held up numerous times for uncertain lengths, retailers will face even more unpredictability as they must wait for manufacturers to sort through compliance issues before handling their own.

Those compliance-centric upstream and midstream delays imperil more than access to inventory. HFA receives daily outreach from confused and concerned

member retailers whose businesses are paralyzed while they try to plan for dual-track compliance.

When inventory provides the fuel for a business to run, uncertainty about fuel availability takes road trips off the table. That's what happened to Miskelly Furniture, which scrapped plans to open a new store this year because these unknown variables made business expansion too risky. Brakenridge Furniture is likewise uncertain how to plan for its year because even before the final rule, supply chains for casegoods (like the CSUs that this rule covers) remain significantly behind. HFA reports that its members are afraid to invest in inventory because of the high risk that what counts as compliant in May could become non-compliant in December. Retailers simply do not have the funds to make these purchases twice.

Retailers have a vested interest in safety. They want to fill their warehouses, showrooms, and delivery trucks with safe items for all customers, especially the smallest ones. But their ability to do so assumes that retailers can keep their inventory stocked, which is unlikely with the dual-track compliance regime's countless uncertainties.

## II.     The Agency Failed to Consider Significant Sources of Increased Costs to Retailers and, Ultimately, to Consumers.

In considering the new rule's costs, the agency failed to adequately consider significant additional costs to retailers. *See* 15 U.S.C. § 2058(f)(3)(E) (requiring

"benefits expected from the rule [to] bear a reasonable relationship to its costs"). HFA and NRF worked hard during the rulemaking to have these retailer concerns heard and heeded by the agency, but to no avail.[5] Indeed, the Final Regulatory Analysis concludes that "[t]he costs associated with the rule include costs to manufacturers and importers, as well as costs to consumers"—retailers' costs are noticeably absent. *See* RE.51; *see also* RE.59 ("Retailers would be indirectly impacted by this rule only to the extent that they would need to buy compliant units from manufacturers or importers.").

But Retailers will have significant costs associated with the new rule that represent a threat to their businesses' survival. These include the costs and difficulty of mixing compliant and non-compliant inventory, increased furniture weight, hangtag training for retail associates, and potentially redesigning retail websites to include hangtag information.

### A.    Mixing Compliant and Non-Compliant Inventory

Under the final rule, CSUs manufactured after the upcoming effective date (May 24) must comply with the rule to be sold in America. Although the rule does not prohibit retailers from selling existing non-compliant inventory, juggling compliant and non-compliant inventory puts retailers in an untenable position.

---

[5]    *See* HFA 4/19/22 cmt.; HFA 4/6/22 cmt.; NRF 10/18/22 cmt., CPSC-2017-0044-0124.

Retailers cannot simply discard non-compliant, existing inventory come May. To avoid catastrophic losses, they will need to sell-through the inventory that they have already purchased and have in stock. Indeed, as the agency recognizes, it is unlikely that retailers could obtain compliant CSUs before May. *See* RE.54 (recognizing likelihood that "hundreds of manufacturers, including importers, will have to modify potentially several thousand CSU models to comply with the rule").

During the inevitable period of mixed inventory, some CSUs will meet the new rule's requirements and bear the newly required hangtag, while others will be hangtag-free. Anna Ferguson, owner of Brakenridge Furniture, anticipates that customers will view products without hangtags as unsafe, which will make them harder to sell and will backlog inventory. Likewise, Miskelly Furniture typically takes three to six months to clear existing inventory—but this cycling will take longer once inventory is mixed. By the time that retailers phase in CSUs that comply with the agency's rule, those same items may well be non-compliant and the rule superseded via STURDY.

Likewise, if manufacturers discontinue models based on the new rule, this will devalue inventory beyond CSUs that retailers have already purchased. A significant portion of Retailers' CSUs are sold as part of bedroom sets that include complementary furniture of the same style and finish (typically bed frames,

nightstands, dressers, and mirrors). Miskelly Furniture estimates that over 75% of its CSU sales come from bedroom sets. If a product is discontinued or altered so that it no longer matches, this reduces the prospects for customers hoping to buy additional pieces of matching furniture. *See* HFA 4/6/22 cmt. 2.

This is particularly concerning because it will hurt the many customers with limited budgets who buy (and often finance) set items over time. *Id.* Because matching sets are important to many consumers, the inability to reliably provide matching products will hurt retailers' revenue and the goodwill that they have generated in their communities.

**B.    Weight Increases**

To comply with the rule, manufacturers will make CSUs heavier. That added weight will cause vast and costly ripple effects on retailers, which the agency failed to adequately consider.

Heavier products create serious safety concerns from sales, delivery, installation, and personnel standpoints—matters that especially affect retailers. HFA members are gravely concerned about their warehouse and delivery teams' abilities to safely handle much heavier products—particularly for pieces of furniture like the already large CSUs. Heavier products add extra risk of employee injury, potential workers' compensation claims, and difficulty in finding and retaining

employees who can handle the strain. *See* U.S. Small Bus. Admin. (SBA) 4/18/22 cmt. 4, CPSC-2017-0044-0104 ("[I]n some instances the new requirements will make the products so heavy they will pose a risk of injury to those delivering the item to the purchaser.").

Brakenridge Furniture has four long-time warehouse employees who move furniture by hand—there is no warehouse equipment that lifts, stacks, or carries. Oscar Miskelly, owner of Miskelly Furniture, is particularly concerned about additional weight and increased injury risks because dressers and chests of drawers—furniture covered by the new rule—already make up some of the heaviest furniture that his warehouse employees handle. Greater weight also creates potential safety risks for consumers, who will have difficulty safely moving larger pieces within their homes after initial delivery.

In addition to safety concerns, greater weight also strains retailer resources. Miskelly Furniture and Brakenridge Furniture offer flat-fee delivery services based on distance, which allows them to provide the highly valued service of affordable, reliable delivery.

But greater weight poses challenges for this last-mile delivery—heavier CSUs will require more delivery workers, more fuel, and potentially more and different

delivery trucks. *See* HFA 4/19/22 cmt. 2. In turn, this may require Retailers to raise their delivery prices at the risk of alienating already price-sensitive consumers.

Likewise, many HFA members ship lighter-weight, ready-to-assemble items using FedEx or UPS as lower-cost shipping options; however, the expected, added weight could make those items too heavy for those shipping outlets. This would force retailers to deliver via freight at much higher costs. *See id.*

The agency attempts to hand-wave the weight-related concerns away, responding that the final rule is a "performance standard" and that it does not require adding weight. Final Rule Briefing Package (Final Package) 524, Consumer Prod. Safety Comm'n, https://tinyurl.com/ysf99u3d. But this minimizes the reality that adding weight is a recognized, authorized compliance option. Even more than that, though, the agency's own testing "suggest[s] that to comply with the draft final rule, CSUs, on average, will become heavier than CSUs currently on the market." Final Package 492 n.81. CSUs will get significantly heavier, and that extra weight will trigger considerable and immediate costs for retailers.

## C.    Employee Training

The agency also overlooked other retailer costs, like training employees on how to understand and educate customers on stability ratings shown on the newly required hangtags. HFA raised these concerns in response to the proposed rule, but

the final rulemaking failed to address this cost. *See* HFA 4/6/22 cmt. 3 ("There will also be extensive staff training for retail associates to confidently explain the safety standard to consumers.").

Person-to-person sales are an integral part of the retail furniture business. Store employees must know how to explain product features and requirements to gain customer trust and, ultimately, sell products. As consumers approach showrooms and notice these new, tough-to-interpret and jargon-filled hangtags, they will have questions for sales associates about the safety ratings and what went into them. As the consumer-facing part of this business, retailers must thoroughly explain these safety standards and discuss the safe uses of these products with consumers. *See* RE.72–73.

Training retail employees to understand, interpret, and communicate the complex information on the newly required hangtags will involve hours of employee training. Every day, Miskelly Furniture's 100-plus showroom salespeople provide customers with knowledgeable guidance on products and furniture selections. Owner Oscar Miskelly estimates that his businesses will need to spend hours training employees on how to accurately and helpfully explain the hangtags, or risk losing customer confidence and, ultimately, sales. Likewise, Brakenridge Furniture anticipates that it will need to train its four showroom-floor salespeople. Now

imagine the time, resources, and employee hours (plus wages) that retailers from coast-to-coast will expend to equip their salespeople with digestible customer-focused explanations for the new hangtags. The agency failed to consider these issues.

### D.    Online Hangtag Confusion

Last but not least, the agency's late-added online-hangtag requirement risks imposing a significant burden on retailers. Under the Final Rule, any CSU manufacturers or importers offering online sales must provide all hangtag information on their websites, with specific size, location, and link requirements. *See* 16 C.F.R. § 1261.6(b). Although the online-hangtag requirement does not expressly apply to "retailers," it is unclear if a retailer who qualifies as a manufacturer or, more likely, an importer, must comply with this portion of the rule. This requirement has sowed immediate confusion and caused significant concern among retailers.

The rule's language indicates that when retailers import furniture and serve as its first point of sale, they could be wholly responsible for updating their websites to include the required hangtag information. RE.55. If the rule is interpreted in this manner, HFA estimates that the online hangtag requirement could directly impact a significant number of its members. *See* Final Package 577 ("more than 90 percent of CSUs sold in the United States are imported"). Although CSUs delivered to retail

stores from manufacturers will come with the required physical hangtags, there is no reason to believe that manufacturers will give retailers any digital or online information. Manufacturers who are not the point of sale have no incentive—and frankly, no method—to provide the hangtag requirements in an online interface. So, this burden could potentially fall entirely on retailers who otherwise have no involvement in the hangtag process.

This is an additional requirement that was not included in the proposed rule, but the agency concluded in the Final Rule—without meaningful analysis—that it "consider[ed] these costs to be small, or practically negligible." RE.55 n.141. Not so. Take just one example—Miskelly Furniture, which imports furniture and operates its own website, has hundreds of CSUs for sale online, and its inventory is constantly being updated. If the online-hangtag burden falls on Miskelly Furniture, it will need to divert significant employee resources to designing and updating its website to include online-hangtag information. These requirements are complex, and Miskelly Furniture anticipates it will need to hire additional employees at significant expense to keep up with this ongoing work. *See* 16 CFR § 1261.6(b) (specifications include font size, proximity to price, and link requirements).

These hangtag requirements increase the overall cost of rule compliance for retailers, ultimately putting their businesses at risk.

### III.    Increased Costs Will Make Serving Customers and Staying in Business Much Harder for Retailers.

The agency's refrain in response to the significant increased costs of this rule is that each link in the distribution chain can recoup its costs by passing along higher prices to consumers. *E.g.*, RE.57 ("[S]uppliers will be able to cover some or all of the compliance costs of the rule by raising wholesale prices, which, in turn, will result in higher retail prices."); RE.59 ("Retailers can increase the retail price of units to reflect any increase in their wholesale costs and to maintain their profit margin."). As a result, retailers are in the untenable position of having to pass on to their customers the extra costs that the *entire furniture industry* is bearing to comply with the agency's new rule. This is not a solution—it is a real and immediate threat to retailers' survival. Retailers are the arm of the industry that interacts with everyday furniture customers, and their businesses will suffer the consequences.

Retailers cannot afford to eat the costs of the estimated wholesale-price increases resulting from this rule. If wholesale costs rise by the estimated 30–40%, this is potentially devastating. Indeed, the Small Business Administration predicts that the rule's costs will force many small retailers out of business. SBA 4/18/22 cmt. 3. The agency responds that the impact on small retailers will be less than 1 percent of annual revenue because small retailers sell a "wide mix" of products. RE.59. But in addition to being without basis in identifiable data, this has no basis in

Retailers' lived realities. Dressers, chests-of-drawers, and other CSUs are cornerstones of furniture retail. These are necessities common in every bedroom—not discretionary accessories—that represent a significant portion of furniture retailers' sales. Bedroom furniture represents 13% of Brakenridge Furniture's sales and 20% of Miskelly Furniture's sales. In addition, the agency's narrow definition for CSUs likely significantly undercounts the volume of covered furniture. NRF 10/18/22 cmt. 1–2.

But just as retailers cannot absorb these cost increases, retailers also know that their customers cannot shoulder significant price increases. HFA, Miskelly, and Brakenridge hear concerns daily about inflation's pressures on customers' already stretched pocketbooks. And as small furniture stores that serve their communities, Retailers know that significant consumer price increases will drive customers away, potentially to the unregulated resale market.

Anna Ferguson, owner of Brakenridge Furniture, fears that resulting price increases will eliminate her ability to help the very customers this rule tries to protect. Brakenridge Furniture's bargain corner always includes the necessities that someone might need for "starting out or starting over," including an inexpensive chest of drawers. Keeping these pieces at low price points helps Brakenridge Furniture serve single mothers, young families, and others on limited incomes, often

with small children. And being able to offer inexpensive but safe, quality casegoods makes Brakenridge Furniture a trusted resource for its community, which has a median household income of $29,162. [6] Likewise, Miskelly Furniture serves communities with a median income range of $38,293–$75,678.[7] HFA also confirms that its members report serving customers with household incomes of $75,000 or less.[8]

The typical retail customer is extremely price sensitive. This means that to continue to serve their customers, retailers will need to drastically cut costs and limit growth opportunities. But this places another burden on an already overburdened industry. Retailers have faced years of challenges from the pandemic, rising costs, and widespread supply chain disruptions. Now, in the face of already rising inflation, retailers must either pass along untenable price increases to their customers (driving customers away) or internalize these expenses with extreme opportunity costs, like trimming jobs, pausing expansion plans, and potentially risking their businesses' survival.

---

[6]   *See* U.S. Census Bureau, https://tinyurl.com/2kusyrx7 (Natchez, Mississippi); https://tinyurl.com/yswa7s8x (Ferriday, Louisiana).

[7]   *See* U.S. Census Bureau, https://tinyurl.com/2p92vfj4 (Pearl, Mississippi); https://tinyurl.com/5bk7u5kk (Madison, Mississippi); https://tinyurl.com/yc7yyhdn (Hattiesburg, Mississippi).

[8]   HFA 4/6/22 cmt. 2.

Consider what it will mean if Retailers cannot survive. Generations-built family businesses, locally owned and operated stores, and small-business employers are the norm, rather than the exception, in the furniture retail industry.

Take Brakenridge Furniture. If it must close, the Ferriday-Natchez community loses not only a trusted place to get furniture but also an indispensable resource. Since it first opened, Brakenridge has been a place where folks of limited income can get in-house financing for refrigerators, air conditioners, and other household necessities when conventional loans may be unavailable to them. If Miskelly Furniture closes, this does not just shutter beloved stores—it eliminates a major employer in Pearl, Mississippi, and the surrounding region. This is the case for hundreds of retailers and HFA members throughout the Circuit and the country, who fear and will bear the costly ramifications of this rule.

## CONCLUSION

This case does not force retailers and customers to decide between cost and safety. Retailers support mandatory tip-over standards, and STURDY offers a collaborative, already-enacted path forward. But in the meantime, the agency's new rule will wreak havoc on the industry, devastate small businesses, and ultimately drive retailers out of business, without providing commensurate benefits to consumers. And so, Retailers encourage the Court to set aside the agency's rule in

its entirety or, alternatively, vacate and remand the rule for further review. In any event, a stay pending judicial review would lessen the likelihood of requiring the furniture industry—including Retailers—of needing to comply with two different regimes.

Dated:  February 16, 2023                 Respectfully submitted,

                                          /s/Susanna R. Allen
                                          Susanna R. Allen
                                          Shayna M. Goldblatt
                                          **YETTER COLEMAN LLP**
                                          811 Main Street, Suite 4100
                                          Houston, Texas 77002
                                          (713) 632-8000


                                          *Attorneys for Amici Curiae*

## CERTIFICATE OF CONFERENCE

I hereby certify that pursuant to Federal Rule of Appellate Procedure 29(a)(2), on January 30, 2023, I contacted counsel for both the Petitioners and the Respondent by electronic mail seeking consent to file the subject Brief of Amici Curiae and that counsel for both Petitioners and Respondent articulated their consent on January 30, 2023.

/s/Susanna R. Allen

Susanna R. Allen
*Attorney for Amici Curiae*

### CERTIFICATE OF SERVICE

Under Federal Rules of Appellate Procedure 15(c) and 25(d) and Fifth Circuit

Rule 25.2, I certify that on February 16, 2023, a true and correct copy of this brief

was filed with Clerk's Office for the United States Court of Appeals for the Fifth

Circuit using the CM/ECF system and was served on all counsel of record, as listed

below, via the Court's electronic filing system on the same date:

Sarah M. Harris
Whitney D. Hermandorfer
Mark S. Storslee
Clayton P. Phillips
Libby A. Baird
Ikenna N. Ugboaja
WILLIAMS & CONNOLLY LLP
680 Main Avenue SW
Washington, DC 20024
whermandorfer@wc.com

Merrick Garland
Alexander K. Haas
Brian M. Boynton
Mark B. Stern
Courtney L. Dixon
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Alberta E. Mills
United States Consumer Product Safety
Commission
4330 E. West Highway
Bethesda, Maryland 20814


/s/Susanna R. Allen

Susanna R. Allen
*Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) because this document contains 4,260 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2016 in 14-Point Equity A font.

Date:    February 16, 2023          /s/Susanna R. Allen

                                    Susanna R. Allen
                                    *Attorney for Amici Curiae*

1114275