No. 22-60639

In the United States Court of Appeals
for the Fifth Circuit

AMERICAN HOME FURNISHINGS ALLIANCE,
MISSISSIPPI ECONOMIC COUNCIL, AND
MISSISSIPPI MANUFACTURERS ASSOCIATION,
*Petitioners*,

*v.*

UNITED STATES CONSUMER PRODUCT SAFETY COMMISSION,
*Respondent*.

On Petition for Review of a Final Rule of the
United States Consumer Product Safety Commission

**BRIEF FOR *AMICUS CURIAE* THE CHAMBER OF COMMERCE
OF THE UNITED STATES OF AMERICA
SUPPORTING PETITIONER AND VACATUR**

Tyler S. Badgley
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H Street, N.W.
Washington, DC 20062
(202) 463-5337

Brett A. Shumate
Anthony J. Dick
Brinton Lucas
Charles E.T. Roberts
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
bshumate@jonesday.com

J. Benjamin Aguiñaga
JONES DAY
2727 North Harwood Street,
Suite 500
Dallas, TX 75201
(214) 220-3939

*Counsel for* Amicus Curiae

## CERTIFICATE OF INTERESTED PARTIES

The case number for this amicus curiae brief is No. 22-60639, *American Home Furnishings Alliance, Mississippi Economic Council, & Mississippi Manufacturers Association v. United States Consumer Product Safety Commission*. Undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**1) Petitioners:** American Home Furnishings Alliance, Mississippi Economic Council, Mississippi Manufacturers Association

**2) Counsel for Petitioners:** Whitney D. Hermandorfer, Libby Baird, Sarah M. Harris, Clay Phillips, and Mark Storslee, Williams & Connolly, L.L.P.

**3) Respondent:** United States Consumer Product Safety Commission

**4) Counsel for Respondent:** Merrick B. Garland, Brian M. Boynton, Mark R. Freeman, Courtney Dixon, Mark B. Stern, and Alexander K. Haas, U.S. Department of Justice

Alberta E. Mills, United States Consumer Product Safety Commission

**5)** *Amicus Curiae***:** Chamber of Commerce of the United States of America

**6) Counsel for** *Amicus Curiae Chamber of Commerce of the United States of America***:** Brett A. Shumate, Anthony J. Dick, Brinton Lucas, Charles E.T. Roberts, and J. Benjamin Aguiñaga, Jones Day

Tyler S. Badgley and Jordan L. Von Bokern, U.S. Chamber Litigation Center

**7)** *Amicus Curiae***:** New Civil Liberties Alliance

**8) Counsel for** *Amicus Curiae New Civil Liberties Alliance***:** Gregory Dolin, John J. Vecchione, Mark Chenoweth, and Philip Hamburger, New Civil Liberties Alliance

**9)** *Amici Curiae***:** North American Home Furnishings Association, National Retail Federation, Brakenridge Furniture Company, Miskelly Furniture, Pearl, Miskelly Furniture, Madison, Miskelly Furniture, Hattiesburg, Miskelly Clearancestore, Miskelly Roomstore

**10)** Counsel for *Amici Curiae HFA, NRF, Brakenridge Furniture Company, Miskelly Furniture, Pearl, Miskelly Furniture, Madison, Miskelly Furniture, Hattiesburg, Miskelly Clearancestore, Miskelly Roomstore*: Susanna R. Allen and Shayna M. Goldblatt, Yetter Coleman LLP

**11) Disclosure Statement:** The Chamber of Commerce of the United States of America is a nonprofit organization organized under the laws of the District of Columbia. It has no parent corporation, and no publicly held company owns ten percent or more of its stock.

/s/ Brett A. Shumate
Brett A. Shumate

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PARTIES ........................................... i

TABLE OF AUTHORITIES ................................................................. v

INTEREST OF *AMICUS CURIAE* ............................................................ 1

SUMMARY OF ARGUMENT ................................................................ 2

ARGUMENT ..................................................................................... 6

I.   THE COMMISSION'S MANDATORY NEW RULE
     UNLAWFULLY OVERRIDES VOLUNTARY STANDARDS .......... 6

     A.   Congress Directed The Commission To Defer To
          Voluntary Industry Standards Over Mandatory Ones .............. 7

     B.   Congress's Preference For Voluntary Standards
          Makes Sense ................................................................ 10

     C.   The Commission's Override Of The Industry's
          Voluntary Standard Is Unlawful ....................................... 15

II.  THE COMMISSION'S REMOVAL RESTRICTION
     VIOLATES ARTICLE II OF THE CONSTITUTION ..................... 20

     A.   Executive Officers Must Be Removable At Will By The
          President, With Only Two Narrow Exceptions ...................... 21

     B.   The Commission Does Not Fit Within Either Exception,
          And The Removal Restriction Is Thus Unconstitutional ......... 25

     C.   The Government's Contrary Arguments Lack Merit ............... 29

CONCLUSION ...................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aqua Slide 'N' Dive Corp. v. CPSC,*
  569 F.2d 831 (5th Cir. 1978) .................................................................. 9

*Bldg. Offs. & Code Adm'rs v. Code Tech., Inc.,*
  628 F.2d 730 (1st Cir. 1980) ................................................................ 14

*Bowsher v. Synar,*
  478 U.S. 714 (1986) .............................................................................. 22

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ............................................................................ 27, 28

*CCC Info. Servs., Inc. v. MacLean Hunter Mkt. Reps., Inc.,*
  44 F.3d 61 (2d Cir. 1994) ..................................................................... 13

*Collins v. Yellen,*
  141 S. Ct. 1761 (2021) ......................................................................... 27

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.,*
  846 F.2d 284 (5th Cir. 1988) ............................................................... 13

*Consumers' Rsch. v. CPSC,*
  592 F. Supp. 3d 568 (E.D. Tex. 2022) ...................................... *passim*

*Env't Def. Fund v. FERC,*
  2 F.4th 953 (D.C. Cir. 2021) ............................................................... 19

*Finnbin, LLC v. CPSC,*
  45 F.4th 127 (D.C. Cir. 2022) ..................................................... 8, 9, 27

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) ....................................................... 30, 32, 33, 34

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) ............................................................... *passim*

*Kisor v. Wilkie,*
  139 S. Ct. 2400 (2019) ......................................................................... 29

*Lucia v. SEC,*
  138 S. Ct. 2044 (2018) ......................................................................... 28

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State
    Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................. 16

*Myers v. United States*,
    272 U.S. 52 (1926) .................................................................. 21

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ................................................................ 19

*Pitre Bros. Transfer, Inc. v. United States*,
    580 F.2d 140 (5th Cir. 1978) ................................................. 18

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) ............................................. 18

*Rodriguez v. United States*,
    480 U.S. 522 (1987) (per curiam) ......................................... 16

*Seila Law LLC v. CFPB*,
    140 S. Ct. 2183 (2020) ..................................................... *passim*

*Southland Mower Co. v. CPSC*,
    619 F.2d 499 (5th Cir. 1980) ................................................... 6

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) ................................................. 15

*Wiener v. United States*,
    357 U.S. 349 (1958) ................................................................ 24

*Zen Magnets, LLC v. CPSC*,
    841 F.3d 1141 (10th Cir. 2016) ............................................... 9

**STATUTES**

5 U.S.C. § 706 .............................................................................. 3, 6

6 U.S.C. § 321m ............................................................................. 10

15 U.S.C. § 272 .............................................................................. 11

15 U.S.C. § 278h-1 ......................................................................... 10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

15 U.S.C. § 1193...................................................................... 10

15 U.S.C. § 1194...................................................................... 27

15 U.S.C. § 1262.............................................................. 10, 27

15 U.S.C. § 1472...................................................................... 27

15 U.S.C. § 2053........................................................................ 5

15 U.S.C. § 2054........................................................................ 7

15 U.S.C. § 2056.................................................... 6, 7, 15, 27

15 U.S.C. § 2057...................................................................... 27

15 U.S.C. § 2058.................................................... 6, 7, 17, 18

15 U.S.C. § 2064...................................................................... 28

15 U.S.C. § 2069.............................................................. 26, 28

15 U.S.C. § 2071...................................................................... 26

15 U.S.C. § 2076.............................................................. 26, 28

15 U.S.C. § 2234...................................................................... 10

15 U.S.C. § 7464...................................................................... 11

20 U.S.C. § 1018b.................................................................... 11

29 U.S.C. § 655........................................................................ 10

42 U.S.C. § 300i-2.................................................................... 11

43 U.S.C. § 2806...................................................................... 11

47 U.S.C. § 1006...................................................................... 11

Pub. L. No. 92-573, 86 Stat. 1207 (1972)............................ 27

National Technology Transfer & Advancement Act of 1995,
    Pub. L. No. 104-113, 110 Stat. 775.................................. 11

Consolidated Appropriation Act,
    Pub. L. No. 117-328,136 Stat 4459 (2022) ..................... 8, 18

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

OTHER AUTHORITIES

Admin. Conf. of the U.S., *Miscellaneous Amendments*,
44 Fed. Reg. 1,357 (Jan. 5, 1979) ...................................................... 12

1 *Annals of Cong.* (1789) (Joseph Gales ed., 1834) ........................... 21, 23

16 C.F.R. § 1025.11 ............................................................................. 28

16 C.F.R. § 1025.55 ............................................................................. 28

16 C.F.R. § 1031.4 ............................................................................... 17

16 C.F.R. pt. 1118 ............................................................................... 28

David H. Carpenter, Cong. Rsch. Serv., R45174,
*The CPSA: A Legal Analysis* (Apr. 24, 2018) ..................................... 8

142 Cong. Rec. H1266 (daily ed. Feb. 27, 1996)
(Statement of Rep. Brown) .................................................................. 11

CPSC, *Civil Penalties; Notice of Adjusted Maximum
Amounts*, 86 Fed. Reg. 68,244 (Dec. 1, 2021) ................................... 28

CPSC, *Legal Memorandum: Proposed Rule: Safety
Standard for CSUs* (July 14, 2021) .................................................... 19

CPSC, *Performance Budget Request to Congress:
Fiscal Year 2023* (Mar. 28, 2022) ....................................................... 9

CPSC, *Safety Standard for CSUs*,
87 Fed. Reg. 72,598 (Nov. 25, 2022) ................................. 15, 16, 17, 18

Fed. R. App. P. 29 .................................................................................. 1

H.R. 1314, 117th Cong. (as passed by House, June 23, 2021) ............... 19

Allan H. Meltzer, *A History of the Federal Reserve,
Volume 1: 1913-1951* (2003) .............................................................. 31

Allan H. Meltzer, *A History of the Federal Reserve,
Volume 2, Book 2, 1970-1986* (2009) .................................................. 31

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

National Institute of Standards & Technology, *Eighth Annual Report on Federal Agency Use of Voluntary Consensus Standards and Conformity Assessment* (2005) ............... 12

National Institute of Standards & Technology, *Twenty-Fifth Annual Report on Federal Agency Use of Voluntary Consensus Standards and Conformity Assessment* (2023) ............... 12

OMB, *Issuance of Circular No. A-119, "Federal Participation in the Development and Use of Voluntary Standards,"* 47 Fed. Reg. 49,496 (Nov. 1, 1982) ..................................... 12

*Regulatory Restructuring: Balancing the Independence of the Federal Reserve in Monetary Policy with Systemic Risk Regulation: Hearing Before the Subcomm. on Domestic Monetary Pol'y and Tech. of the H. Comm. on Fin. Servs.,* 111th Cong. 59 (2009) ......................................................... 31

S. 3232, 117th Cong. (as passed by Senate, Sept. 29, 2022) .................. 18

U.S. Gov't Accountability Off., GAO-12-582, *CPSC: A More Active Role in Voluntary Standards Development Should Be Considered* (2012) ......................................................... 13

John C. Yoo, *President's Authority To Remove the Chairman of the CPSC*, 25 Op. O.L.C. 171 (2001) ............................................. 27

# INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

Businesses are subject to regulations promulgated by, and are defendants in administrative adjudications and judicial actions brought by, the Consumer Product Safety Commission (CPSC or the Commission). The Chamber therefore has a strong interest in ensuring

---

[1] No counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

that the Commission complies with Congress's command not to issue mandatory safety standards when voluntary safety standards are working. When federal agencies override voluntary standards, as CPSC did here, businesses are saddled with unnecessary regulations imposing burdensome compliance costs.

The Chamber also has a strong interest in ensuring that the Commission's exercise of its power to affect the interests of businesses by issuing rules, presiding over administrative proceedings, and initiating judicial actions is vested in officials whose appointment and tenure accord with the requirements of the Constitution. Where, as here, the exercise of rulemaking authority under the Consumer Product Safety Act (CPSA) impacts the rights and interests of companies subject to CPSC's regulations, the Constitution requires that those officials be fully accountable to the President elected by the People.

## SUMMARY OF ARGUMENT

**I.** CPSC's new rule for clothing-storage furniture units (CSUs) exceeds the agency's authority under the CPSA and is arbitrary and capricious under the Administrative Procedure Act (APA). The CPSA requires CPSC to refrain from imposing mandatory safety standards and

instead rely upon voluntary safety standards as long as they adequately reduce the risk of consumer injury. Under the APA, agency rulemaking is unlawful if it is inconsistent with governing statutes. 5 U.S.C. § 706(2)(C). By overriding the voluntary safety standard here (known as F2057), failing to adequately consider F2057, and entirely ignoring recent federal legislation specifically regarding CSUs, CPSC violated the CPSA and the APA.

For over 40 years, CPSC has been subject to one of the most stringent rulemaking schemes in the U.S. Code. That scheme reflects Congress's explicit policy preference for adaptive, collaborative, voluntary standards over inflexible federal rules. That policy has worked for decades, including specifically in the context of CSUs, to enhance both consumer safety and value. And it fits comfortably within Congress's broader policy of preferring voluntary standards for both public and private regulatory uses.

Lately, however, the Commission has begun rushing out mandatory rules in defiance of Congress's careful design, without the requisite deference to voluntary standards. CPSC's new rule for CSUs is unlawful for at least two reasons: First, it is contrary to law under the APA because

it violates the CPSA's clear requirement that mandatory standards not be imposed when voluntary standards are working. Second, CPSC acted arbitrarily and capriciously by failing to adequately consider the industry's update to F2057 and by ignoring Congress's recent enactment of the "Stop Tip-overs of Unstable, Risky Dressers on Youth Act" (STURDY Act), which are important factors that the agency needed to consider.

**II.** This case also presents fundamental questions about the Constitution's structural protections—in particular, the President's ability to control subordinate officers who wield substantial executive power. These questions are currently pending before this Court in *Consumers' Research v. CPSC*, No. 22-40328 (5th Cir. oral argument scheduled Mar. 6, 2023). The Commissioners promulgate regulations setting nationwide safety standards like the CSU rule at issue here. They decide administrative enforcement actions in which companies and individuals have their rights and interests adjudicated. And they initiate enforcement actions in federal court.

The Commissioners' significant executive authority underscores the importance of ensuring that they are accountable to the President as

the Constitution requires. But they are insulated from presidential control by statutory tenure protection that bars their removal absent "neglect of duty or malfeasance in office." 15 U.S.C. § 2053(a).

In *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), the Supreme Court explained that Article II of the Constitution empowers the President to control his subordinates in the Executive Branch, including the power to remove them at will. Limiting the President's removal power not only frustrates his ability to faithfully execute the laws, but also frustrates the public's ability to hold the Executive Branch accountable.

The Supreme Court has recognized only two narrow exceptions to the President's removal power. First, Congress may limit the removal of inferior officers who have "limited duties and no policymaking or administrative authority." *Id*. at 2200. And second, Congress may sometimes limit removal for "multimember expert agencies that do not wield substantial executive power." *Id*. at 2199-200. But that marks the "outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id*. at 2200.

Neither exception applies here because the Commissioners are not inferior officers, and they clearly wield substantial executive power. They

enforce a sweeping array of federal laws by, among other things, filing suits in court seeking to impose monetary penalties on defendants. Restricting the removal of the Commissioners is thus a clear violation of Article II, as it improperly subverts the President's constitutional power to control the Executive Branch.

## ARGUMENT

### I.   THE COMMISSION'S MANDATORY NEW RULE UNLAWFULLY OVERRIDES VOLUNTARY STANDARDS.

In the CPSA, Congress strictly limited the Commission's authority to issue mandatory rules if voluntary safety standards would adequately reduce the risk of injury. *See* 15 U.S.C. §§ 2056(b)(1), 2058(f)(3). This Congressional preference for voluntary standards makes sense, because they are effective and serve important policy objectives, whereas inflexible federal rules "tend to freeze technology, stifle research aimed at better and cheaper compliance measures, and deprive consumers of the opportunity to choose among competing designs." *Southland Mower Co. v. CPSC*, 619 F.2d 499, 515 (5th Cir. 1980). CPSC's new rule for CSUs exceeds the agency's authority because it overrides the industry's voluntary standard, 15 U.S.C. § 2056(b)(1), and therefore violates the APA, 5 U.S.C. § 706(2)(C). The rule is also arbitrary and capricious

because it fails to adequately consider updates to that standard and ignores Congress's recent, specific enactment regarding CSU safety standards.

### A.    Congress Directed The Commission To Defer To Voluntary Industry Standards Over Mandatory Ones.

**1.** In 1981, Congress mandated that CPSC "shall rely upon voluntary consumer product safety standards," rather than issue a mandatory standard, "whenever compliance with such voluntary standards would eliminate or adequately reduce the risk of injury addressed" by the voluntary standards, if "it is likely that there will be substantial compliance with such voluntary standards." 15 U.S.C. § 2056(b)(1). CPSC thus cannot issue a mandatory standard unless existing voluntary standards fail to meet specific criteria Congress established. *Id.* § 2058(f)(3)(D).

Congress's scheme also enlists CPSC in developing and improving voluntary standards, in cooperation with industry stakeholders. *Id.* § 2054(a)(4). Further, CPSC must halt consideration of a proposed mandatory standard if a sufficient voluntary standard is issued. *Id.* § 2058(b). Thus, as the Commission recently admitted, the agency's "general authority to promulgate safety standards is cabined" when

voluntary standards are in play. Br. for Resp. at 2-3, *Finnbin, LLC v. CPSC*, 45 F.4th 127 (D.C. Cir. 2022) (No. 21-1180), 2022 WL 326414, at *2-3.

During the course of this rulemaking, Congress enacted the STURDY Act, directing CPSC to promulgate (by December 2023) a rule specific to CSUs. Before imposing that rule, however, Congress required that CPSC consider whether any qualifying voluntary standard satisfies new stability-testing criteria and, if so, adopt that standard. Consolidated Appropriation Act, Pub. L. No. 117-328, tit. II, div. BB, § 201, 136 Stat 4459, 5552-55 (2022).

**2.** Few courts have had occasion to enforce this preference for voluntary standards—likely because CPSC only recently began to rush out a slew of mandatory new rules in defiance of the CPSA's scheme. Indeed, between its establishment in 1972 and 2018, CPSC promulgated "approximately 40 mandatory safety rules and product bans" (combined), less than one per year. David H. Carpenter, Cong. Rsch. Serv., R45174, *The CPSA: A Legal Analysis* 10 (Apr. 24, 2018). And "[m]ost of these rules were implemented prior to the 1981 amendments that generally required the Commission to defer to voluntary safety standards." *Id.* By contrast,

in 2022 alone, CPSC promulgated five mandatory final rules and proposed three others. CPSC, *Performance Budget Request to Congress: Fiscal Year 2023* 29 (Mar. 28, 2022), https://tinyurl.com/2p82bd5u. It also announced plans to promulgate six mandatory final rules and propose three others in 2023 alone. *Id.* This rapid acceleration in the velocity of agency rulemaking flouts Congress's carefully calibrated scheme.

Courts that have addressed the issue have recognized the rigor the CPSA requires. For example, the D.C. Circuit recently observed that CPSC "must stay its hand" in the face of a voluntary standard. *Finnbin*, 45 F.4th at 131. A Tenth Circuit panel including then-Judge Gorsuch vacated a CPSC rule, noting that the "prerequisite factual findings, which are compulsory under the [Act], [were] incomplete and inadequately explained." *Zen Magnets, LLC v. CPSC*, 841 F.3d 1141, 1144 (10th Cir. 2016). That was so even though that regulation did not implicate a voluntary standard. *Id.* at 1147 & n.7. This Court also observed that the CPSA requires a "harder look" than the APA's arbitrary-and-capricious standard, even before the 1981 amendments heightened the agency's burden to account for voluntary standards. *Aqua Slide 'N' Dive Corp. v. CPSC*, 569 F.2d 831, 837 (5th Cir. 1978).

**B.    Congress's Preference For Voluntary Standards Makes Sense.**

Although the CPSA's procedural requirements stand out for their rigor, the Act is hardly alone among federal authorities recognizing the value of voluntary standards and preferring them to mandatory ones. That is because voluntary standards are efficient and effective means of enhancing both consumer safety and value through cooperation between public and private stakeholders.

**1.** The CPSA's preference for voluntary standards bears a strong resemblance to several other federal statutes. For example, the Federal Hazardous Substances Act and the Flammable Fabrics Act also instruct the Commission to defer to voluntary standards over mandatory rules. 15 U.S.C. §§ 1262(g)(2), 1193(h)(2). The Occupational Health and Safety Act raises that agency's burden to explain why any mandatory rule that "differs substantially from an existing national consensus standard" would "better effectuate the purposes" of that Act over the national consensus standard. 29 U.S.C. § 655(b)(8). Examples of other Congressional instructions to adopt or prefer voluntary standards abound. *E.g.*, 6 U.S.C. § 321m(b)(2)(B) (emergency management and preparedness); 15 U.S.C. § 278h-1(c) (artificial intelligence); 15 U.S.C.

§ 2234 (firefighter health and safety); 15 U.S.C. § 7464(c)(2) (identity management); 20 U.S.C. § 1018b(c) (student aid delivery); 42 U.S.C. § 300i-2(f)(2) (community water systems); 43 U.S.C. § 2806(b)(2) (geospatial data); 47 U.S.C. § 1006(a)(2) (telecommunications).

Congress even required that "all Federal agencies and departments shall use technical standards that are developed or adopted by voluntary consensus standards bodies, using such technical standards as a means to carry out policy objectives or activities determined by the agencies and departments," unless it would be "inconsistent with applicable law or otherwise impractical." National Technology Transfer & Advancement Act of 1995, Pub. L. No. 104-113, § 12(d), 110 Stat. 775, 783 (codified at 15 U.S.C. § 272 note). And Congress concluded that consensus standards "are developed with great care and expertise in an open, democratic manner which makes U.S. voluntary standards the envy of the world.... These groups are better equipped than the Government to understand all points of view and to keep up with the state of the art in technical standards." 142 Cong. Rec. H1266 (daily ed. Feb. 27, 1996) (Statement of Rep. Brown).

Agencies have "continue[d] to look overwhelmingly to the private sector to fulfill government needs rather than creating new government-unique standards." National Institute of Standards & Technology, *Eighth Annual Report on Federal Agency Use of Voluntary Consensus Standards and Conformity Assessment* 1 (2005), https://tinyurl.com/mrx6vt39. This cooperation helps "reduce costs and regulatory burden, provide incentives and opportunities that encourage growth of U.S. enterprises, [and] realize benefits from public-private collaboration in standards setting." National Institute of Standards & Technology, *Twenty-Fifth Annual Report on Federal Agency Use of Voluntary Consensus Standards and Conformity Assessment* 1 (2023), https://tinyurl.com/5x4kc8r9.

Even before Congress codified this preference for voluntary standards, the Executive Branch had long recognized that it is "more efficient[] and effective[]" for regulators to use voluntary standards created through a consensus process by private organizations with "expertise" in an industry, than it is for the government to formulate its own top-down standard for an industry. Admin. Conf. of the U.S., *Miscellaneous Amendments*, 44 Fed. Reg. 1,357, 1,357 (Jan. 5, 1979); *see* OMB, *Issuance of Circular No. A-119, "Federal Participation in the*

*Development and Use of Voluntary Standards*," 47 Fed. Reg. 49,496 (Nov. 1, 1982).

**2.** The vast majority of private associations involved in promulgating voluntary standards are professional, trade, and other groups that develop guidelines not to make a profit, but rather to provide useful information to members, outside industry participants, government entities, and the public. *See Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 296 (5th Cir. 1988) (noting that these associations' activities save "buyers the trouble of investigating products themselves and the risk of trying untested products"); *see also* U.S. Gov't Accountability Off., GAO-12-582, *CPSC: A More Active Role in Voluntary Standards Development Should Be Considered* 4-5 (2012), https://tinyurl.com/y5s5r659 (discussing "standards development organizations" and their exhaustive processes for developing voluntary standards).

These activities have contributed significantly to the public good. Indeed, so vital is the role of private associations that federal, state, and local governments increasingly look to the standards promulgated by private associations for adoption into law. *See, e.g., CCC Info. Servs., Inc.*

*v. MacLean Hunter Mkt. Reps., Inc.*, 44 F.3d 61, 74 n.30 (2d Cir. 1994) (noting "the increasing trend toward state and federal adoptions of model codes"); *Bldg. Offs. & Code Adm'rs v. Code Tech., Inc.*, 628 F.2d 730, 732 (1st Cir. 1980) (noting that voluntary safety standards are "used throughout the United States and Canada by state and local jurisdictions"). These private standard-setting activities play a prominent role in promoting the public health and welfare, the importance of which cannot be overstated: private associations' specialized knowledge, resources, and relationships to industry make them uniquely well-suited to promulgate and enforce standards designed to ensure the delivery of high-quality, safe goods to the public.

The CSU industry, in partnership with the American Society for Testing Materials (ASTM), has worked for decades on seven revisions of an exhaustive voluntary standard for CSUs. *See* Add. 149, 208, Dkt. No. 19-2. That cooperative, iterative work between Petitioners, ASTM, industry, government, and the public has significantly enhanced safety and value for consumers. CPSC's hasty reversal threatens that progress.

### C.    The Commission's Override Of The Industry's Voluntary Standard Is Unlawful.

Petitioners ably explain why CPSC's new CSU rule is unlawful, but a few points warrant emphasis.

**1.** CPSC cannot substitute its judgment for Congress's statutory preference of voluntary safety standards over mandatory ones. It is well-established that agencies are "'bound, not only by the ultimate purposes Congress has selected but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Texas v. United States*, 497 F.3d 491, 502 (5th Cir. 2007).

Here, the means imposed by Congress require the Commission to yield to the industry's 2019 voluntary standard (F2057). 15 U.S.C. § 2056(b)(1). Despite this requirement, CPSC concedes only that it "*could* rely on the voluntary standard." CPSC, *Safety Standard for CSUs*, 87 Fed. Reg. 72,598, 72,651 (Nov. 25, 2022) (emphasis added). Although the Commission stated that the industry's 2019 standard "does not adequately reduce the risk of tip overs," *id.* at 72,606, ASTM recently updated F2057 to address CPSC's criticisms of it—including by increasing tested weight, accounting for carpeted surfaces, and simulating clothing-filled drawers, *see* Pet'rs Br. 12-14—and CPSC

concedes that update "may improve the stability of [CSUs]," 87 Fed. Reg. at 72,651.

In refusing to fully consider ASTM's update to F2057, *id.*, CPSC seeks to elevate its own preference for mandatory rules above Congress's preference for voluntary standards. "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam). Vacating CPSC's new rule is necessary to give effect to Congress's command that the agency yield to the industry's voluntary standard.

**2.** At the very least, CPSC acted arbitrarily and capriciously because it did not adequately consider at least two "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Those are ASTM's updates to F2057 and recent legislation known as the STURDY Act.

**A.** Under the CPSA, CPSC must consider whether industry intends "to modify or develop a voluntary consumer product safety standard to

address the risk of injury." 15 U.S.C. § 2058(a)(6). CPSC also must consider less "burdensome" alternatives to any mandatory rule, which logically includes updated voluntary standards. *Id.* § 2058(f)(3)(F). Commission regulations even permit it to "defer … a mandatory rulemaking proceeding and request the voluntary standards organization to revise the standard." 16 C.F.R. § 1031.4(a)(4).

Despite the requirement to prefer voluntary standards, CPSC failed to adequately consider ASTM's updates to F2057 before issuing the final rule. As Petitioners explain, those revisions address the risks of injury from tip-overs. Pet'r Br. 12-14. Indeed, the Commission acknowledged that the update "may improve the stability of [CSUs]" over the 2019 standard. 87 Fed. Reg. at 72,651. But nowhere in the final rule did CPSC adequately explain why it thinks these improvements would not sufficiently address the risks of injury.

Although the Commission acknowledged the industry's effort to update the 2019 voluntary standard, *id.*, CPSC inadequately explained its rejection of the updated voluntary standard. Crucially, CPSC *must* consider less "burdensome" alternatives to a mandatory rule—which includes any voluntary safety standard. 15 U.S.C. § 2058(f)(3)(F).

Although the agency nodded to staff concerns about the update, 87 Fed. Reg. at 72,651, the CPSA directs CPSC itself to make *specific* findings about the need for mandatory rulemaking, 15 U.S.C. § 2058(f)(3). CPSC failed to make *any* findings in support of its conclusory statement about the revisions' adequacy.

That cursory rejection was arbitrary and capricious. *See Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004) ("A statutorily mandated factor, by definition, is an important aspect of any issue before an administrative agency…."); *Pitre Bros. Transfer, Inc. v. United States*, 580 F.2d 140, 143-44 (5th Cir. 1978) (requiring more than "perfunctory" treatment of relevant questions).

**b.** CPSC also buried its head in the sand regarding the recent STURDY Act, which directs the agency to consider whether "any" voluntary standard *specific to CSUs* meets the Act's criteria and, if so, to adopt the voluntary standard as a mandatory one. STURDY § 201. CPSC was well aware of the STURDY Act *and* its implications for this rulemaking.[2] Indeed, CPSC general counsel's office admitted that "if the

---

[2] Predecessor versions of the STURDY Act passed the Senate and the House before CPSC finalized the rule. *See* S. 3232, 117th Cong. (as

Sturdy Act is passed, a new [notice of proposed rulemaking] would likely be necessary." CPSC, *Legal Memorandum: Proposed Rule: Safety Standard for CSUs* (July 14, 2021), https://tinyurl.com/yv63knn5. Petitioner American Home Furnishings Alliance also specifically raised the STURDY Act in comments on the proposed rule. *See* Bill Perdue, Comment Letter on CSU Tip Overs (Jan. 12, 2022), *available at* https://tinyurl.com/499553fy.

It is hard to imagine a more important factor to consider than a change to "the agency's enabling Act" directly bearing on the rulemaking's exact subject. *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646 (1990). Yet neither the final nor proposed rule mentions (let alone grapples with) the STURDY Act. That "ostrich-like approach flies in the face" of reasoned decisionmaking. *Env't Def. Fund v. FERC*, 2 F.4th 953, 975 (D.C. Cir. 2021).

The final rule thus shirks CPSC's statutory obligation to yield to voluntary safety standards and reverses the agency's historical cooperation with industry associations, to the detriment of consumers

---

passed by Senate, Sept. 29, 2022); H.R. 1314, 117th Cong. (as passed by House, June 23, 2021).

and industry alike. To ensure that CPSC stays within the bounds of its statutory authority and complies with its duty to engage in reasoned decisionmaking, the final rule should be vacated.

## II. THE COMMISSION'S REMOVAL RESTRICTION VIOLATES ARTICLE II OF THE CONSTITUTION.

The Commission's unlawful promulgation of the rule is especially egregious here in light of the unconstitutional statutory removal restriction that insulates the Commissioners from political accountability. Article II of the Constitution requires the executive power to be vested in the President, who is accountable to the people through the ballot box. As a general rule, the President has inherent authority to remove subordinate officers at will, to ensure a full measure of accountability for the Executive Branch.

The Supreme Court has held that principal officers may not be insulated from removal if they wield substantial executive power. CPSC clearly does so, as it has robust authority to enforce federal law and issue new rules with the force and effect of law. The statutory removal restriction that insulates the Commissioners from presidential control and accountability is thus unconstitutional.

### A.    Executive Officers Must Be Removable At Will By The President, With Only Two Narrow Exceptions.

Article II vests the entirety of "the executive power" in "the President," who must "take care that the laws be faithfully executed." *Myers v. United States*, 272 U.S. 52, 163-64 (1926). To ensure that the Executive Branch remains accountable to the President, and ultimately to the voters, Article II also endows the President with "the power of appointing, overseeing, and controlling" the subordinate officers "who execute the  laws" on his behalf. *Seila Law LLC*, 140 S. Ct. at 2197 (quoting 1 *Annals of Cong.* 481 (1789) (Joseph Gales ed., 1834) (James Madison)). The power to control executive officials, in turn, "includes the ability to remove" them. *Id*. Otherwise, the President would have no way to ensure that executive officials obey his commands. He "could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id*. at 2191.

**1.**    The Supreme Court has long recognized that the removal power is "essential to the execution of the laws by" the President. *Id.* at 2198 (quoting *Myers*, 272 U.S. at 117). Once officers are appointed, "it is 'only the authority that can remove' such officials that they 'must fear and, in

the performance of [their] functions, obey.'" *Id.* at 2197 (quoting *Bowsher v. Synar*, 478 U.S. 714, 726 (1986)).

The extensive governmental power exercised by the "vast and varied federal bureaucracy" amplifies the need to "ensure that the Executive Branch is overseen by a President accountable to the people." *Id.* at 2207. Federal agencies exercise broad regulatory authority to "dictate and enforce policy for ... vital segment[s] of the economy affecting millions of Americans." *Id.* at 2204. "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher*, 478 U.S. at 733. Often these agencies also are empowered to "bring the coercive power of the state to bear on millions of private citizens ... through administrative adjudications and civil actions." *Seila Law*, 140 S. Ct. at 2200-01. That "enforcement authority" is "a quintessentially executive power." *Id.* at 2200.

Insulating officials who wield executive authority from control by the President disrupts the "constitutional strategy" for ensuring democratic accountability for the exercise of Executive authority. *Id.* at 2203. The President would be able to disavow responsibility for these officials' actions, pointing to his inability to remove them—leaving the

people unable to hold the President, or anyone else, responsible for the agencies' actions.

It is therefore critical to the constitutional plan that "individual executive officials" who wield "significant authority" remain "subject to the ongoing supervision and control of the elected President." *Id.* "Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'" *Id.* (quoting 1 *Annals of Cong.* 499 (James Madison)).

**2.** The President's power to remove executive officers is, for the reasons just discussed, "the rule, not the exception." *Id.* at 2206. The Supreme Court has recognized only two narrow exceptions to the President's power to remove subordinate officers. *First*, Congress may restrict the ability of principal officers to remove inferior officers who have "limited duties and no policymaking or administrative authority." *Id.* at 2200. *Second*, and potentially relevant here, Congress may, under certain circumstances, limit the power of the President to remove the principal officers of "multimember expert agencies that do not wield substantial executive power." *Id.* at 2199-200. Those two exceptions

demarcate the "outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* at 2200.

The second exception, for members of multimember expert agencies who do not wield substantial executive power, was initially recognized in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). At issue in *Humphrey's Executor* was a for-cause removal protection for the commissioners of the Federal Trade Commission (FTC). Critically, the *Humphrey's Executor* Court "viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Seila Law*, 140 S. Ct. at 2198 (quoting *Humphrey's*, 295 U.S. at 628); *see Wiener v. United States*, 357 U.S. 349, 353 (1958) (noting that Court's "sharp line of cleavage" between executive and non-executive functions). Instead, the FTC performed "specified duties as a legislative or as a judicial aid." *Humphrey's*, 295 U.S. at 628. As a "legislative agency," it "ma[de] investigations and reports thereon for the information of Congress," and as a "judicial department[]," it made recommendations to courts. *Id.* Any action the FTC undertook under the "direct[ion]" of the President was "collateral to" those "main" functions. *Id.* at 628 n.1.

As the Supreme Court has since explained, the *Humphrey's Executor* exception applies only to a very limited subset of multimember agencies—those "that do not wield substantial executive power." *Seila Law*, 140 S. Ct. at 2199-200. "Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" *Id.* at 2198. And for purposes of determining the scope of the *Humphrey's Executor* exception, "what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court." *Id.* at 2200 n.4.

### B. The Commission Does Not Fit Within Either Exception, And The Removal Restriction Is Thus Unconstitutional.

The Commission is unconstitutional as it does not fall within either exception to the President's removal power. The Commissioners are not "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 140 S. Ct. at 2200. And while the agency is a "multimember" body, it does not fit within the *Humphrey's Executor* exception because it exercises "substantial executive power." *Id.* at 2199-200.

At the outset, it is undeniable that Commissioners "are principal, rather than inferior, officers ... and hold significant policymaking and administrative authority." *Consumers' Rsch. v. CPSC*, 592 F. Supp. 3d 568, 581 (E.D. Tex. 2022), *appeal pending*, No. 22-40328 (5th Cir.). The government has never even tried to argue otherwise.

Accordingly, the *Humphrey's Executor* exception is the only one that could even potentially apply here. Contrary to the agency's suggestion, however, "the Commission exercises substantial executive power and therefore does not fall within the *Humphrey's Executor* exception," *Consumers' Rsch.*, 592 F. Supp. 3d at 583-84.

First, the Commission wields substantial executive power because it has robust "enforcement authority," which "includes the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*." *Seila Law*, 140 S. Ct. at 2200. Specifically, it can bring suits seeking injunctive relief and civil penalties of up to $100,000 per violation, and up to $17,150,000 for a series of violations. *See* 15 U.S.C. §§ 2069, 2071, 2076(b)(7). Thus, as even the government agrees, "the CPSC's main responsibilities include" its "law-

enforcement functions," John C. Yoo, *President's Authority To Remove the Chairman of the CPSC*, 25 Op. O.L.C. 171, 173 (2001)—a classic example of "executive power," *Buckley v. Valeo*, 424 U.S. 1, 139 (1976).

Second, Commissioners also wield executive power by issuing administrative regulations like the new CSU rule challenged here. The agency's rulemaking authority primarily stems from CPSA, Pub. L. No. 92-573, 86 Stat. 1207 (1972), which gives the Commission "broad authority to promulgate 'performance requirements' for consumer products," *Finnbin, LLC*, 45 F.4th at 134 (quoting 15 U.S.C. § 2056(a)), and the power to ban "hazardous product[s]," 15 U.S.C. § 2057. Other statutes provide the agency with comparable authority to regulate a variety of consumer products. *See, e.g.*, *id.* § 1194(c) (flammability standards for fabric); *id.* § 1262(f) (hazardous substance bans); *id.* § 1472(a) (packaging standards for household substances). CPSC regulations are "binding rules" that "flesh[] out" those statutes, *Seila Law*, 140 S. Ct. at 2200, a power that the Supreme Court has characterized as "the very essence of 'execution' of the law," *Collins v. Yellen*, 141 S. Ct. 1761, 1785 (2021). Indeed, "[a]t oral argument [in

*Consumers' Research*], the Government conceded this authority was an executive power." *Consumers' Rsch.*, 592 F. Supp. 3d at 584.

Third, Commissioners also exert substantial executive authority when they investigate product safety incidents and issue product recalls. In the course of investigating, CPSC has power to issue subpoenas and take testimony, 15 U.S.C. § 2076(a)-(b); 16 C.F.R. pt. 1118, which are exercises of "significant authority pursuant to the laws of the United States," *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (quoting *Buckley*, 424 U.S. at 126). The Commission may issue orders requiring manufacturers, distributors, and retailors to repair and replace products, and to refund consumers. 15 U.S.C. § 2064(d)(1).

Fourth, in response to violations of consumer product law, the Commission may commence, and ultimately render final decisions in, administrative adjudicative proceedings that could result in civil penalties of up to $17,150,000 per related series of violations. *Id.* § 2069(a)(1); 16 C.F.R. §§ 1025.11(a), 1025.55; CPSC, *Civil Penalties; Notice of Adjusted Maximum Amounts*, 86 Fed. Reg. 68,244 (Dec. 1, 2021). Those adjudicative actions "bring the coercive power of the state to bear on millions of private citizens and businesses." *Seila Law*, 140

S. Ct. at 2200; *see Kisor v. Wilkie*, 139 S. Ct. 2400, 2422 (2019) ("[E]ven when agency activities take ... 'judicial' forms, they continue to be exercises of the executive Power." (quotation marks and alterations omitted)). Thus, "as the Supreme Court said in *Seila Law*, agency adjudication in this form '*must be*' an exercise of executive authority." *Consumers' Rsch.*, 592 F. Supp. 3d at 584 (quoting *Seila Law*, 140 S. Ct. at 2198 n.2).

For all of these reasons, CPSC plainly "exercises substantial executive power," and thus "*Humphrey's Executor* does not apply." *Id.*

## C.    The Government's Contrary Arguments Lack Merit.

The Commission has argued in another case challenging CPSC's structure—and suggested in its stay briefing here—that Supreme Court precedents foreclose lower courts from "limit[ing] the holding of *Humphrey's Executor*" by holding that it does not cover the Commission. *See* Br. for Appellant at 29, *Consumers' Rsch. v. CPSC*, No. 22-40328 (5th Cir. Aug. 31, 2022) ("*Consumers' Rsch.* CPSC Br."). That mischaracterizes the Supreme Court's precedents.

To begin with, this Court would not be "limiting" the holding of *Humphrey's Executor* by simply holding that the Commission does not fit

within the exception recognized in that case. The "general rule" is that the President has the power to remove executive officers. *Seila Law*, 140 S. Ct. at 2198. *Humphrey's Executor* announced one of "two exceptions" to that general rule. *Id.* That exception does not apply broadly to *all* multi-member regulatory agencies. Rather, it encompasses only "multimember expert agencies that *do not wield substantial executive power.*" *Id.* at 2199-200 (emphasis added); *see id.* at 2211 (Thomas, J., concurring in part and dissenting in part) (emphasizing this precondition of the exception). Although CPSC is a multimember agency, its Commissioners exercise "substantial executive power." *Consumers' Rsch.*, 592 F. Supp. 3d at 583-84. Thus, the question here is not whether to limit *Humphrey's Executor* in any way, but instead whether a removal restriction should be allowed in a "new situation" that *Humphrey's Executor* did not consider. *Seila Law*, 140 S. Ct. at 2201.[3]

---

[3] Even if the Court were inclined to extend *Humphrey's Executor*, there is no "historical precedent" to support doing so here. *Seila Law*, 140 S. Ct. at 2201 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010)). The CPSC is not comparable to an institution like the Federal Reserve Board that "historically enjoyed some insulation from the President" and therefore could "claim a special historical status." *Id.* at 2202 n.8; *see id.* at 2232-33 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part) (discussing

The Commission has argued that the 1935 FTC (the agency at issue in *Humphrey's Executor*) "also had ... 'substantial executive power.'" *Consumers' Rsch.* CPSC Br. at 33. But as noted above, the Supreme Court has held that it is irrelevant that the 1935 FTC may have had "broader rulemaking, enforcement, and adjudicatory powers than the *Humphrey's* Court appreciated." *Seila Law*, 140 S. Ct. at 2200 n.4; *see id.* at 2198 n.2. "[W]hat matters is the set of powers the Court considered as the basis for its decision," *id.* at 2200 n.4, and those powers were said to include "no

---

the history of the Federal Reserve). That independence was "well established in the first twenty years" of the Federal Reserve's existence. Allan H. Meltzer, *A History of the Federal Reserve, Volume 1: 1913-1951* 737 (2003); *see generally* Allan H. Meltzer, *A History of the Federal Reserve, Volume 2, Book 2, 1970-1986* 1223 (2009) (discussing the presidential "tradition of not interfering in Federal Reserve decisions"). The Board's independence is a "critical part of the institutionalization of a low-inflation policy" that prevents administrations from financing deficits by printing money or allocating credit to favored groups. Meltzer, *A History of the Federal Reserve, Volume 2, Book 2, 1970-1986*, *supra*, at 1252; *see also Regulatory Restructuring: Balancing the Independence of the Federal Reserve in Monetary Policy with Systemic Risk Regulation: Hearing Before the Subcomm. on Domestic Monetary Pol'y and Tech. of the H. Comm. on Fin. Servs.*, 111th Cong. 59 (2009) (statement of Donald L. Kohn, Vice Chairman, Federal Reserve Board) (discussing historical examples of "non-independent central banks being forced to finance large government budget deficits").

part of the executive power," *id.* at 2198 (quoting *Humphrey's*, 295 U.S. at 628).

In any event, the government itself has recognized that the 1935 FTC considered in *Humphrey's Executor* was meaningfully different from agencies such as CPSC that have the core executive power of enforcing the law by filing lawsuits seeking penalties in court. As the Solicitor General told the Supreme Court just a few years ago in *Seila Law*, "the FTC in 1935" lacked "the ability to bring enforcement suits in federal court seeking retrospective relief"—a power that "'cannot possibly be regarded' as anything other than an exercise of the executive power and duty vested solely in the President." U.S. Br. 32, *Seila Law*, 140 S. Ct. 2183 (No. 19-7), 2019 WL 6727094. The Supreme Court agreed, emphasizing that "the power to seek daunting monetary penalties against private parties on behalf of the United States in federal court" is "a quintessentially executive power not considered in *Humphrey's Executor*." 140 S. Ct. at 2200.

The Commission's reliance on other Supreme Court opinions in support of its contention that the *Humphrey's Executor* exception encompasses all multi-member expert agencies is misplaced. *Free*

*Enterprise Fund v. Public Co. Accounting Oversight Board* noted that the exception applies to "independent agencies run by principal officers" in "certain circumstances." 561 U.S. 477, 483 (2010); *see id.* at 493 (the exception applies to "certain independent agencies"). But *Free Enterprise* had no occasion to address what those "circumstances" might be. The Court opined only on the "modest" question of the constitutionality of "two layers of for-cause tenure" protection. *Id.* at 501.

Ten years later, in *Seila Law*, the Court more fully explained that *Humphrey's Executor* applies only to "expert agencies that do not wield substantial executive power." 140 S. Ct. at 2199-200. The Court then struck down removal protection for the CFPB Director, who did wield considerable "executive power." *Id.* at 2200.

The Commission likewise cites dicta from *Seila Law* stating that there "may" be "alternative [statutory] responses'" that Congress can pursue to fix the defect in the CFPB's structure, including "converting the CFPB into a multimember agency." *Consumers' Rsch.* CPSC Br. at 28 (quoting *Seila Law*, 140 S. Ct. at 2211). But the Court did not hold that a multimember CFPB wielding substantial executive power would

automatically pass muster. The Court was simply noting that Congress, unlike courts, can "rewrite" statutes to correct constitutional defects.

The Commission cannot explain why an unaccountable executive agency would be any worse if it had multiple heads instead of a single head. The fundamental problem is the lack of control and accountability to a President "elected by the people." *Seila Law*, 140 S. Ct. at 2203. No matter how many unremovable heads there are, the President is hobbled in his ability to exercise "meaningful supervision" of the agency. *Id.* Just as a President could be "saddled with a holdover [CFPB] Director from a competing political party," *id.* at 2204, so too he could be saddled with a hostile CPSC due to the Commissioners' staggered terms. Either way, the Chief Executive would be reduced to the role of "cajoler-in-chief," *Free Enter. Fund*, 561 U.S. at 502.

The restriction on removal of Commissioners impermissibly dilutes the President's control over officials who indisputably exercise significant executive power, subverting both his "ability to ensure that the laws are faithfully executed" as well as "the public's ability to pass judgment on his efforts." *Id.* at 498. For that reason, the removal restrictions violate the Constitution.

# CONCLUSION

For these reasons, the final rule should be vacated.

Dated: February 17, 2023                    Respectfully submitted,


                                            */s/ Brett A. Shumate*

Tyler S. Badgley                            Brett A. Shumate
Jordan L. Von Bokern                        Anthony J. Dick
U.S. Chamber Litigation Center              Brinton Lucas
1615 H Street, N.W.                         Charles E.T. Roberts
Washington, DC 20062                        JONES DAY
(202) 463-5337                              51 Louisiana Avenue, N.W.
                                            Washington, DC 20001
                                            (202) 879-3939
                                            bshumate@jonesday.com

                                            J. Benjamin Aguiñaga
                                            JONES DAY
                                            2727 North Harwood Street,
                                            Suite 500
                                            Dallas, TX 75201
                                            (214) 220-3939


                                            *Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), the undersigned attorney for Appellant certifies that the foregoing brief

(i)    complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because it contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

(ii)    complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) and Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Century Schoolbook Std.

*/s/ Brett A. Shumate*
Brett A. Shumate

**CERTIFICATE OF SERVICE**

In accordance with Circuit Rule 25(a), I hereby certify that on February 17, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Brett A. Shumate*
Brett A. Shumate